**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kevin D. JOHNSON, Defendant–Appellant.**

No. 91–1621.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 1, 1992.

Decided July 29, 1993.

Stephen B. Clark, Asst. U.S. Atty. (argued), Michael Jude Quinley, Office of the U.S. Atty., Crim. Div., Fairview Heights, IL, for plaintiff-appellee.

Daniel S. Alexander (argued), Chicago, IL, for defendant-appellant.

Before CUDAHY and RIPPLE, Circuit Judges, and LAY, Senior Circuit Judge.*

LAY, Senior Circuit Judge.

Kevin D. Johnson was charged with knowingly and intentionally possessing with intent to distribute more than 50 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) (1981), and using and carrying a firearm in relation to drug trafficking in violation of 18 U.S.C. § 924(C) (1984). The jury found Johnson guilty of the drug charge, but not guilty of the firearm charge. At sentencing, the district court assigned Johnson a base offense level 32 under the Sentencing Guidelines for the quantity of drugs involved and then adjusted upward three levels for his role in the offense. Johnson was sentenced to 188 months imprisonment and he now appeals. We affirm in part and reverse and remand in part.

I. FACTS

On July 25, 1990, Special Agent Donald Veal executed a search warrant on Kevin Johnson's residence at 1416 North 40th

---

* Hon. Donald P. Lay, of the Eighth Circuit, sitting by designation.

Street in East St. Louis, Illinois. James O'Neill, a former neighbor of the Johnsons, had informed Agent Veal that Johnson was running a "crack house" from an abandoned residence across the street from the Roosevelt Projects.[1] During the search of Johnson's bedroom, officers uncovered a .22 caliber revolver, over $25,000 in cash, various amounts of cocaine base, including a jar containing crystallized crack, a jar containing liquid with a "trace amount" of crack (Government Exhibit 7), and other assorted drug paraphernalia. Agents also found several envelopes addressed to Kevin Johnson at the 1416 North 40th Street address and to a residence at 1125 North 44th Street.

## II. DISCUSSION

### A. Calculation of the base offense level

■ Johnson asserts that the court erred in including the weight of the liquid in Government Exhibit 7 to determine his base offense level. The total weight of the cocaine base recovered, including cutting agents and adulterants, but not including the water was 47.4 grams.[2] The weight of the waste water was 31.89 grams. Inclusion of the weight of the waste water with the 47.4 grams increased the base offense level by two points and the mandatory sentence from five years to ten years. Johnson argues that the liquid was waste material leftover from the cocaine base manufacturing process and that it should not be included under the Sentencing Guidelines.[3]

Section 2D1.1 of the Sentencing Guidelines states:

Unless otherwise specified, the weight of a controlled substance set forth in the [Drug Quantity Table] refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.

U.S.S.G. § 2D1.1. Application note 1 adds: " 'Mixture or substance' as used in this guideline has the same meaning as in 21 U.S.C. § 841."[4]

Exhibit 7 contained a "trace amount of cocaine" suspended in liquid, but the suspended particles could not be weighed. Because the liquid was not marketable and could not in any way be used as a drug, Johnson argues that it is not a "mixture" as contemplated by Congress. The government urges that to accept defendant's argument would be to ignore the plain meaning of the statute and its interpretation by the Supreme Court. We disagree.

In *Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the Supreme Court addressed the meaning of the terms "mixture or substance" under 21 U.S.C. § 841. In *Chapman*, defendants had been convicted of selling ten sheets of blotter paper containing LSD in violation of 21 U.S.C. § 841(a). Although the weight of the LSD alone was approximately 50 milligrams, the trial court included the weight of the blotter paper—the carrier medium on which the LSD had been sprayed—to find the defendants responsible for 5.7 grams of LSD. This finding resulted in a five year mandatory minimum sentence. The Court upheld the trial court's use of the weight of the blotter paper containing LSD to determine the defendants' minimum sentences. *Chapman*, at ——, 111 S.Ct. at 1922.

---

1. Informant O'Neill had disclosed that 12–15 teenage boys were selling the drugs for Johnson. Simultaneous with the search of the 1416 North 40th Street address, other officers searched the alleged "crack house" at 1125 North 44th Street, an abandoned house where Johnson had resided with his family two to three months earlier. Although there was no running water or electricity in the house, agents discovered five males ages 15 to 18 there. No drugs were found at that address.

2. Because the cocaine base was only about fifty percent pure, the amount of pure cocaine base recovered was approximately 29.5 grams.

3. The process of manufacturing cocaine base or "crack" consists of mixing regular cocaine and baking soda in water. The mixture is then heated. The cocaine base can be removed with a spoon when it settles to the bottom of the water.

4. 21 U.S.C. § 841(b)(1)(A)(iii) (1981) reads:

In the case of a violation of subsection (a) of this section involving—50 grams or more of a mixture or substance described in clause (ii) which contains cocaine base such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life. . . .

■ The Court found that in passing the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (1986), Congress had adopted a "market-oriented" approach to punishing drug trafficking. Under this approach, the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of sentence. *Chapman,* at ——, 111 S.Ct. at 1925 (citing H.R.Rep. No. 99–845, pt. 1, pp. 11–1, 17 (1986)). The Court specifically determined that:

> [Congress] intended the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found—cut or uncut, pure or impure, *ready for wholesale or ready for distribution at the retail level.* Congress did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug, because such traffickers keep the street markets going.

*Id.* (citing H.R.Rep. No. 99–845, *supra* at pt. 1, p. 12) (emphasis added). Congress therefore set mandatory minimum sentences corresponding to the weight of the "mixture or substance containing a detectable amount of" the various controlled substances, including LSD. *Chapman,* at ——, 111 S.Ct. at 1925.

The Court concluded that the blotter paper was a "mixture or substance containing a detectable amount" of LSD. Adopting an ordinary dictionary definition of the word "mixture," [5] the Court stated:

> The LSD is diffused among the fibers of the paper. Like heroine or cocaine mixed with cutting agents, the LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar

cube carrying LSD can be and often is ingested with the drug. *Id.* at ——, 111 S.Ct. at 1926. The Court further stressed that Congress had a rational basis for its choice of penalties for LSD distribution. The penalty scheme assigns more severe penalties to the distribution of larger quantities of drugs.

> By measuring the quantity of the drugs according to the "street weight" of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute and the Sentencing Guidelines increase the penalty for persons who possess large quantities of drugs, regardless of their purity.

*Id.* at ——, 111 S.Ct. at 1927–28.

The government urges that the statute and *Chapman* require inclusion of the total weight of the waste water because it is clearly a mixture as that word is commonly understood. The government focuses on the fact that the cocaine residue and the water are "two substances blended together so that the particles of one are diffused among the particles of the other." *Chapman,* at ——, 111 S.Ct. at 1926. We do not agree that Congress intended or that *Chapman* requires such a narrow understanding of the term "mixture" in this context.

The *Chapman* Court's inclusion of the weight of the blotter paper is rational in light of congressional intent and the unique characteristics of LSD. Congress intended penalties to be based on the "street weight of the drug" in the form in which it is sold. Its focus was on the weight of drug mixtures "ready for wholesale or ready for distribution at the retail level." *Id.* at ——, 111 S.Ct. at 1925. The unique characteristics of LSD thus required inclusion of the weight of the blotter paper. An average dose of LSD weighs approximately .05 milligrams.[6] The

---

5. According to the Webster Third International Dictionary, a "mixture" is defined to include "a portion of a matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." Webster Third New International Dictionary 1449 (1986). A mixture may also consist of two substances blended together so that the particles of one are diffused among the

particles of the other. 9 Oxford English Dictionary 921 (2d ed. 1989).

6. Pure LSD is dissolved in a solvent such as alcohol and is either sprayed on paper or gelatin, or the paper is dipped in the solution. The solvent evaporates, leaving minute amounts of LSD trapped in the paper or gel. Then the paper or gel is cut into "one dose" squares and sold by the dose. Users either swallow the squares, lick

Supreme Court acknowledged that "LSD is not sold by weight, but by dose, and a carrier medium ... is used to facilitate the distribution of the drug. Blotter paper makes LSD easier to transport, store, conceal and sell." *Id.* at ——, 111 S.Ct. at 1928. Blotter paper or other LSD carriers are the only way that LSD can be distributed, ingested and weighed. "Functionally ... like an egg and cheese omelette, [they become] a single product." *United States v. Acosta,* 963 F.2d 551, 554 (2nd Cir.1992). Thus, inclusion of the weight of the blotter paper was not only rational, but also "necessary." *Id.*

The unique characteristics of LSD do not exist in the present case. The waste water does not serve as a dilutant, cutting agent or carrier medium for the cocaine base. It does not "facilitate the distribution," *Chapman,* —— U.S. at ——, 111 S.Ct. at 1928, of the cocaine in that cocaine is not dependent on the water for ingestion, and unlike a dilutant or cutting agent, the waste water does not in any way increase the amount of drug available at the retail level. The liquid, with just a trace of cocaine base, is merely a by-product of the manufacturing process [7] with no use or market value. The waste water is not ready for distribution at the wholesale or retail level because it will never be distribut-

ed at all. Under a market-oriented approach, when the mixture is not ingestible and therefore not marketable, there is no rational basis to a sentence based on the entire weight of a useless mixture. *United States v. Acosta,* 963 F.2d at 555.

To read the statute or *Chapman* as requiring inclusion of the weight of *all* mixtures, whether or not they are useable, ingestible, or marketable, leads to absurd and irrational results contrary to congressional intent. The defendant asks us to imagine a marijuana farmer who harvests his crop, leaving a few traces of the illegal plants on the ground. The farmer then plows his field to prepare for next year's crop and in so doing mixes the traces of marijuana with the soil. Is the farmer accountable for all the marijuana he harvested as well as the combined weight of all his topsoil? [8] As the Second Circuit pointed out, it is function not form that is critical. *Acosta,* 963 F.2d at 554. Congress was clearly concerned with mixtures that will eventually reach the streets, i.e. consumable mixtures. *Chapman,* —— U.S. at ——, 111 S.Ct. at 1926, 1927–28.[9]

■ We also find that a broad application of *Chapman,* as urged by the government, undermines the primary concern of the Sen-

them until the drug is released, or drop them into a beverage, thereby releasing the drug. *Chapman,* at ——, 111 S.Ct. at 1923.

7. The defendant was not charged for manufacturing the drug.

8. Moreover, if Johnson had dumped Exhibit 7 into the toilet as agents burst through the door, and the agents extracted all the water from the toilet along with the unusable trace of cocaine base, Johnson could face life imprisonment for the same unusable waste water that now subjects him to a minimum ten years.

9. *But see, United States v. Maheche–Onofre,* 936 F.2d 623, 625–26 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991) (holding that the entire weight of the suitcase minus the metal parts could be included in the sentencing calculation. The court reasoned that "ingestion" would not seem to play a critical role in the definition of "mixture" or "substance."); *United States v. Restrepo–Contreras,* 942 F.2d 96 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 955, 117 L.Ed.2d 123 (1992) (sentencing calculation must be based on entire weight of statues made of beeswax and cocaine).

The Second Circuit in *United States v. Acosta,* 963 F.2d 551 (2d Cir.1991), disagreed with the reasoning of the First Circuit in the above two decisions. In not calculating the weight of a creme liquor, used to transport the 2.245 kilograms of pure cocaine, the Second Circuit reasoned that the cocaine was not usable until distilled out of the creme liquor. The court stated:

Congress has made clear that the *weight* of drugs sold at the wholesale or retail level, rather than their *purity,* is the yardstick of culpability. The problem, however, is that under a market-oriented approach, when the mixture is not ingestible (and therefore not marketable), there is no reason to base a sentence on the entire weight of a useless mixture. The issue here is marketability, not purity. This distinction was highlighted by the Eleventh Circuit when it held that the sentence was to be based on the amount of the usable mixture—not the pure cocaine, but the cocaine mixed with the ingestible cutting agents. For this reason, we are constrained to disagree with the First Circuit.

*Acosta,* 963 F.2d at 555 (citations and footnote omitted).

tencing Guidelines in promoting rational and uniform sentences. Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity. U.S.S.G. Ch. 1, Pt. A at 1.2 (1990). In *United States v. Rolande–Gabriel*, 938 F.2d 1231, 1235 (11th Cir.1991), the Eleventh Circuit held that only the 72 grams of a liquid cocaine mixture which were usable or consumable should be included in the sentencing calculation. "A hyper-technical or mechanical application of the statutory language defeats the purpose of the Sentencing Guidelines...." *Id.* The court held that inclusion of the weight of the unusable mixtures leads to widely divergent sentences for conduct of relatively equal severity. *Id.* at 1235; *see also United States v. Jennings*, 945 F.2d 129, 136–37 (6th Cir.1991); *United States v. Acosta*, 963 F.2d at 555.

We do not dispute that cutting agents and dilutants can be factored into the weight calculation. Nor do we have a case where a suitcase or object is the carrier medium of a blended drug. In the present case, the waste water was not a carrier and was not a useable, ingestible or marketable mixture. We hold that it was error to include the weight of the liquid in the sentencing calculus.

### B. *Role in the offense enhancement*

■ Johnson argues that the district court erred in enhancing his sentence three levels pursuant to U.S.S.G. § 3B1.1(b).[10] He claims there was insufficient evidence to support this finding and that the district court's record is unreasonably vague because it does not identify the five or more participants whom Johnson allegedly managed. Absent a contention that the district court has misconstrued the Guidelines, we review the court's enhancement under section 3B1.1 for clear error. *See, e.g., United States v. Ruiz*, 932 F.2d 1174, 1183 (7th Cir.1991).

■ District courts are encouraged to support findings of facts in sentencing proceedings with subsidiary findings, both to "aid the district court in identifying relevant factors in applying the Guidelines and to guide the reviewing court to the evidentiary basis for a sentencing determination." *United States v. Hernandez*, 931 F.2d 16, 18 n. 2 (7th Cir. 1991) (per curiam). *See also United States v. Lanese*, 890 F.2d 1284, 1294 (2d Cir.1989) ("Since on the record before this court, it is unclear whether there is sufficient evidence to support the district court's determination as to the number of 'participants' for purposes of § 3B1.1(b), we remand to the district court for a specific findings as to the identities of the 'participants'"). In *United States v. Jewel*, 947 F.2d 224, 235–36 (7th Cir.1991), this court found that the district court erred by failing to indicate which of the alleged participants each defendant supervised or managed. The case was remanded to the district court for a specific finding as to the identities of the "participants" because the district court "left unclear the evidentiary basis for [its] sentencing determination." *Id.* at 235.

■ In the present case, special Agent Don Veal testified at trial that informant James O'Neill told him that Johnson used ten to fifteen teenagers to distribute the crack on the streets from the abandoned house at 1425 44th Street. There is strong evidence that O'Neill, according to Agent Veal, was not always reliable and tended to exaggerate claims. Although hearsay evidence may be considered for sentencing purposes, *United States v. Beal*, 960 F.2d 629, 634 (7th Cir. 1992), this was the *only* evidence offered to prove that Johnson was a supervisor or manager of at least five participants. There was expert testimony that the defendant was a schizophrenic and not capable of directing or managing a large scale operation. The informant never identified any of the teenage "distributors." Five teenage males were found "camping out" at the abandoned house, but there is absolutely no evidence tying

---

**10.** This section states:

**Aggravating Role**
Based on the defendant's role in the offense, increase the offense level as follows:

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

them to Johnson. No drugs were found on the premises, and none of the teenagers were interviewed or arrested. Finally, the sum of the money held by Johnson and the way the crack was packaged for retail sale into twenty individual baggies prove nothing except that Johnson himself was dealing drugs.

We find the presence of the young men at the abandoned house, without evidence of drug activity, to be without weight and should not be considered in determining whether there should be a three point enhancement. Indeed we can think of a plenitude of reasons why teenage boys would be hanging out in an abandoned house across the street from the Projects that do not lead to the presumption that they were participants in a crack ring.

On the record before us, we do not feel that the district court focused with sufficient precision on the enhancement for Johnson's role in the offense. We therefore remand to the district court for a further finding in this regard.

### C. Downward departure based on mental condition

■ At trial, both prosecution and defense psychiatrists diagnosed Kevin Johnson as borderline mentally retarded and schizophrenic. Beginning in 1983, Johnson had been hospitalized for acute schizophrenia and suffered from hallucinations, distorted thinking patterns, and hearing command voices. In Johnson's first trial of this case, the court declared a mistrial at the close of all evidence due to Johnson's incompetency.

Johnson argues that the district court erred in not departing downward based on his severe mental condition as authorized by U.S.S.G. § 5K2 and § 5K2.13. We find no merit to this claim.

■ A decision not to depart is reviewable on appeal if it is the product of a conclusion that the judge lacks authority to depart. *United States v. Poff*, 926 F.2d 588, 590 (7th Cir.1991). However, we do not review a purely discretionary refusal to depart. *See United States v. Franz*, 886 F.2d 973, 978 (7th Cir.1989). At sentencing, Judge Beatty stated: "I might consider departing as talked

about by [defense counsel], but I'm not sure that would be appropriate, but for that reason, I am going to sentence the defendant to the low end of the range, ie. 188 months ..." We find it clear from this language that Judge Beatty believed he had the authority to depart, but declined to do so because he did not think it appropriate. We therefore find no error.

The case is remanded to the district court for resentencing.

RIPPLE, Circuit Judge, concurring.

I join in the result reached by today's majority, reversal of the sentence imposed upon Mr. Johnson. I write separately to emphasize that we are only called upon to consider a case in which the defendant is charged with possession with intent to *distribute* narcotics.

After careful analysis of *Chapman* and its progeny, the majority focuses upon the passage in *Chapman* that discusses the "market-oriented" approach to punishing drug trafficking. *See Chapman*, —— U.S. ——, ——, 111 S.Ct. 1919, 1925, 114 L.Ed.2d 524 (1991); Majority Op. at 1194–95. I believe that this part of the *Chapman* analysis clearly supports the majority's conclusion that "when the mixture is not ingestible and therefore not marketable, there is no rational basis to a sentence based on the entire weight of a useless mixture." Majority Op. at 1196. As the majority has acknowledged in passing in footnote 7 of its opinion, we need not reach whether there would be any rational basis for a sentence based upon the entire weight of a non-ingestible mixture that is the by-product of a drug manufacturing process, if *manufacturing* of the drug had been charged in the original indictment. Although possession with intent to distribute and manufacturing are proscribed by the same section of the United States Code, they are separate offenses composed of separate elements. *See* 21 U.S.C. § 841(a) (1988); *United States v. Goodman*, 605 F.2d 870, 883–85 (5th Cir. 1979) (sentencing court did not err in imposing separate, consecutive sentences for manufacturing a controlled substance and for possessing with intent to distribute that same controlled substance); *see also United States*

*v. Lendmann,* 757 F.2d 916, 918 (7th Cir. 1985) (under § 841(a), Congress clearly intended to punish manufacturing of narcotics irrespective of an individual's intent to distribute the narcotics). I believe it particularly appropriate to circumscribe narrowly our holding when, as here, the circuits are divided on the issue. *See Walker v. United States,* —— U.S. ——, ——, 113 S.Ct. 443, 443, 121 L.Ed.2d 362 (1992) (White, J., dissenting from denial of certiorari) (acknowledging a split of authority in the circuits over whether weight of an inconsumable by-product of the manufacturing process can be considered for sentencing purposes). I therefore join the judgment and the opinion on the understanding that the opinion ought not be read as addressing the issue of whether the "waste water" recovered in the present circumstances could properly have been weighed had Mr. Johnson been charged with manufacturing crack cocaine.