**Ronald Clyde SEALS, Appellant,**

v.

**The STATE of Texas.**

**No. PD–0678–04.**

Court of Criminal Appeals of Texas, En banc.

Nov. 16, 2005.

**418**

Sharon Ramage, Frisco, for Ronald Clyde Seals.

Manuel Gonzalez, McKinney, Matthew Paul, State's Atty., Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the Court, in which KELLER, P.J., MEYERS, WOMACK, KEASLER, and HERVEY, JJ., joined.

The appellant was convicted of possession of more than one gram but less than four grams of methamphetamine. On direct appeal, the appellant complained that blood found mixed with the methamphetamine was improperly included in the aggregate weight as an adulterant or dilutant. The court of appeals held that the blood could not be an adulterant or dilutant. We will reverse because the court of appeals erred by looking beyond the plain meaning of the legislature's definition of adulterant or dilutant.

### I. Facts

The appellant was indicted for possession of methamphetamine in an amount more than one gram but less than four grams. During the trial, police officers testified that, while they were investigating a tip that the appellant was manufacturing methamphetamine, they discovered a syringe and a vial that were later found to contain methamphetamine. The State's criminalist testified that the contents of the syringe weighed 0.05 grams and the contents of a vial weighed 1.50 grams. The criminalist said that, in addition to methamphetamine, the vial contained nicotinamide (vitamin B3)[1] and blood. The criminalist did not say how much of the vial's 1.50 grams came from each of the three substances.

The appellant admitted possessing less than a gram of methamphetamine. He testified that the vial contained mostly blood waste. According to the appellant, the vial was used to squirt blood and trace amounts of methamphetamine when he was unable to successfully inject the drug into his arm.

The jury convicted the appellant as charged in the indictment. After finding the two enhancement paragraphs true, the jury assessed a punishment of 25 years' imprisonment.

On direct appeal, the appellant complained that the evidence was legally insufficient to support the conviction for possession of more than one gram of methamphetamine. He argued that blood is not an adulterant or dilutant and that the blood in the vial should not have been included in the aggregate weight of the controlled substance. Because the State did not show what portion of the vial was blood, he argued, there was insufficient

---

1. Nicotinamide is a substance commonly used as a controlled substance additive.

evidence to show that the weight of the controlled substance, minus the blood, was greater than one gram.[2]

The court of appeals agreed with the appellant's contention that the blood could not be considered an adulterant or dilutant. The court cited the correct standard for addressing the legal sufficiency of the evidence.[3] Then it held that, as a matter of logic, an adulterant or dilutant cannot include every substance that is mixed with a controlled substance, particularly one introduced after the controlled substance has been used.[4] The court reversed the conviction, found the appellant guilty of the lesser-included offense of possession of less than one gram of methamphetamine, and remanded the case for a new punishment hearing.[5]

We granted review to determine whether, in the appellant's circumstances, the court of appeals correctly held that blood cannot be considered an adulterant or dilutant for a possession offense under the Texas Controlled Substances Act. We shall reverse.

## II. Law and Analysis

■ To convict a defendant for possession of a controlled substance, the State must show that the defendant knowingly or intentionally possessed a controlled substance.[6] A controlled substance is defined as "a substance, including a drug, an adulterant, and a dilutant, listed in Schedule I through V or Penalty Groups 1, 1–A, or 2 through 4."[7] A controlled substance includes the aggregate weight of any mixture, solution, or other substance containing a controlled substance.[8]

According to the Health and Safety Code, an adulterant or dilutant is defined as "any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance."[9] We must determine whether the blood contained in the appellant's vial was an adulterant or dilutant, the weight of which could be included with that of the methamphetamine found mixed in the same vial.

■ When we interpret a statute we seek to effectuate the collective intent or purpose of the legislators who enacted the legislation.[10] Under our decision in *Boykin*, we must interpret an unambiguous statute literally, unless doing so would lead to an absurd result that the legislature could not possibly have intended.[11] If a literal reading of the statute leads to an

---

2. We have held that the State is no longer required to show what amount of a controlled substance and what amount of an adulterant or dilutant make up a mixture for purposes of possession of a controlled substance. *Melton v. State*, 120 S.W.3d 339, 344 (Tex.Crim.App. 2003).

3. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (holding that, when conducting a legal sufficiency review, the reviewing court should view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt).

4. *Seals v. State*, No. 05–03–01105–CR, slip op. at 4, 2004 WL 639678 (Tex. App.-Dallas, delivered Apr. 1, 2004) (not designated for publication).

5. *Id.* slip op., at 5.

6. Tex. Health & Safety Code § 481.116(1).

7. Tex. Health & Safety Code § 481.002(5).

8. *Ibid.*

9. Tex. Health & Safety Code § 481.002(49).

10. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim.App.1991).

11. *Ibid.*

absurd result, we resort to extratextual factors to arrive at a sensible interpretation to effectuate the intent of the legislature.[12] "Where the statute is clear and unambiguous, the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute."[13]

We addressed the terms adulterant and dilutant before they were defined by the legislature. In *Cawthon v. State*, we held that to include an adulterant or dilutant in the aggregate weight of a controlled substance, the State must prove four elements: (1) the identity of the named illegal substance, (2) that the added remainder (adulterants or dilutants) has not affected the chemical activity of the named illegal substance, (3) that the remainder (adulterants or dilutants) was added to the named illegal substance with the intent to increase the bulk or quantity of the final product, and (4) the weight of the illegal substance, including any adulterants or dilutants.[14] As a consequence of the second and third elements, the State was required to identify the alleged adulterant or dilutant to show that it did not affect the chemical activity of the illegal substance and that it was added to increase the bulk or quantity of the final product.

Following our decision in *Cawthon*, the legislature added the definition for adulterants and dilutants cited above. The literal meaning of the legislature's adulterant and dilutant definition is that any substance that is added to or mixed with a controlled substance, regardless of when, how, or why that substance was added, may be added to the aggregate weight of the controlled substance as an adulterant or dilutant.

The language of the legislative definition is similar to the language in *Cawthon*. But, in the first clause, the legislature conspicuously left out the requirement that the State prove intent to increase the bulk or quantity of the controlled substance. The legislature replaced "[a substance] added *with the intent to* increase the bulk or quantity of the final product,"[15] with "*any material* that increases the bulk or quantity of the controlled substance."[16] Also, the second clause of the legislative definition, "regardless of its effect on the chemical activity,"[17] directly eliminates *Cawthon's* second element. A plain reading of the legislature's adulterant or dilutant definition, when compared with *Cawthon's* elements, indicates that the legislature intended to abolish *Cawthon's* limits on what substances are considered to be adulterants or dilutants.

We cannot say that application of the literal meaning of the definition produces absurd results that the legislature could not have intended. It may lead to instances, similar to the appellant's, where the weight of a substance that is not intentionally added to increase the bulk or quantity of a controlled substance is nevertheless used to increase a defendant's penalty. The enactment of the 1994 amendment, without the requirements in *Cawthon*, indicates that the legislature intended this consequence.

The court of appeals did not perform the *Boykin* analysis of the definition. Instead, it concluded that the legislature could not have meant to include certain substances,

---

**12.** *Id.* at 785–86.

**13.** *Id.* at 785.

**14.** *Cawthon v. State,* 849 S.W.2d 346, 349 (Tex.Crim.App.1992).

**15.** *Ibid.*

**16.** Tex. Health & Safety Code § 481.002(49).

**17.** *Ibid.*

such as the blood in this case, within the definition of adulterant or dilutant. The court of appeals erred by failing to consider the literal meaning of the legislature's definition.

In support of the court of appeals's opinion, the appellant alleges that, despite the plain meaning of the legislature's definition, the legislature could not possibly have meant to include the blood found mixed with methamphetamine in the vial. The appellant contends that to read the definition that broadly would be illogical. Such a reading would allow the State to increase punishments by including the weight of substances, like blood, that are not used in the manufacturing or transportation process but instead are unintentionally added following a drug's use. But, as we have said, when the statute is clear and unambiguous, we must take the legislature at its word. It is not for us to add or subtract from such a statute.[18]

One might argue that the legislature meant to include as an adulterant or dilutant only materials that increase the bulk or quantity of the controlled substance *before* distribution, sale, or consumption and that the legislature meant to exclude waste materials or materials that do not increase the bulk or quantity of *salable* or *usable* weight. But these are not the words that the legislature *actually* used. The drafters of the definition could have easily included these terms, but they did not. More to the point, the drafters could have left the definition that this Court used in *McGlothlin v. State*[19] and *Cawthon*,[20] which would have achieved the same result. What message are we to glean from

the legislature's omission of the phrases "before distribution, sale, or consumption"; "waste products"; and "salable or usable weight"? The only interpretation that is permitted under the seminal rule of statutory construction: We presume that the legislature meant what it said.

An inspection of the legislature's definition of adulterant and dilutant within the context of the possession of drug paraphernalia (as opposed to the definition in the context of possession of a controlled substance) is instructive here. An adulterant or dilutant that is drug paraphernalia only is defined as

> a dilutant or adulterant, such as quinine hydrochloride, mannitol, inositol, nicotinamide, dextrose, lactose, or absorbent, blotter-type material, that is *used or intended to be used to increase the amount or weight of or to transfer a controlled substance regardless of whether the dilutant or adulterant diminishes the efficacy of the controlled substance.*[21]

This definition is remarkably similar to the definition of adulterants and dilutants that we used in *McGlothlin* and *Cawthon*, most likely because we used this definition as a guide. The legislature explicitly eschewed the use of this definition for adulterants and dilutants in the context of possession of a controlled substance.[22]

The definition of adulterants or dilutants as drug paraphernalia only is distinct from the definition in the context of possession of a controlled substance, which does not require any demonstration that

**18.** *Boykin,* 818 S.W.2d at 785.

**19.** 749 S.W.2d 856, 860 (Tex.Crim.App.1988).

**20.** 849 S.W.2d at 348–49.

**21.** Tex. Health & Safety Code § 481.002(17)(F).

**22.** *See* Tex. Health & Safety Code § 481.002(49) ("'Adulterant or dilutant' means any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance.").

the substance was used or intended to be used to increase the amount of the controlled substance. We might speculate on the reason for the difference, but we need look no further than another rule of statutory construction: We endeavor to give effect to the whole statute, which includes each word and phrase, if possible.[23] If we were to interpret both definitions in the same manner, we would have to give effect to words that are not present in one definition or we would have to subtract words that are present in the other.

■ We appreciate the need and the concern for rational public policy. It is not our place within the judiciary, however, to construe a statute based on our notions of what is rational or what makes good common sense. It is left to us to effectuate the collective intent or purpose of the legislators who enacted the legislation, which means that we interpret an unambiguous statute literally, unless doing so would lead to an absurd result that the legislature could not possibly have intended.[24] Because the legislature did not include such phrases as "before distribution, sale, or consumption"; "salable or usable weight";

or "excluding waste products," we are not at liberty to add them to the definition.

### III. Conclusion

The court of appeals erred in construing the terms adulterant and dilutant. Because the blood in this case came within the definition of adulterant or dilutant, the evidence was legally sufficient to support the jury's verdict. The judgment of the court of appeals is reversed, and the case is remanded to that court to consider the appellant's remaining point of error.

WOMACK, J., filed a concurring opinion, in which KELLER, P.J., and MEYERS, J., joined.

COCHRAN, J., filed a dissenting opinion, in which JOHNSON and HOLCOMB, JJ., joined.

WOMACK, J., concurring opinion, in which KELLER, P.J., and MEYERS, J., joined.

I join the Court's opinion. This Court's ill-considered definitions of the statutory term "adulterants or dilutants" * led to the enactment of the Legislature's ill-considered definition in its next session. Of

23. *Nguyen v. State*, 1 S.W.3d 694, 696 (Tex. Crim.App.1999).

24. *Boykin*, 818 S.W.2d at 785.

* What this court did was even worse than we say today. In *McGlothlin v. State*, 749 S.W.2d 856, 858 (Tex.Cr.App.1988), the court concluded "that within the field of drugs and controlled substances, 'adulterants' and 'dilutants' are compounds, substances, or solutions added to the controlled substance with the intent to increase the bulk of the product. Or, increase the quantity of the product without affecting its activity." Having thus violated the rules of grammar as well as the rules of statutory construction, the court applied its definition to a flask containing "mostly water" that the State's expert agreed had only "a residual and insignificant amount" of controlled substance in it, on top of which floated

an "organic layer" that was "distinct and observable." This layer seemed to contain most of the controlled substance, and the defendant's expert said it contained less than 400 grams of amphetamine. The court held that the evidence was insufficient to prove the offense of possession of more than 400 grams of amphetamine because "the record contains no evidence that the water was intended to increase the bulk or quantity of the final product." *Id.*, at 861.

In *Cawthon*, four years later, this court simultaneously said that *McGlothlin* "sets forth the only definition of adulterants and dilutants recognized by this Court," and that there was more to the definition: an adulterant or dilutant also must be something that "has not affected the chemical activity of the named illegal substance." *Cawthon v. State*, 849 S.W.2d 346, 348–49 (Tex.Cr.App.1992).

course, this Court had no authority to invent a definition that was not based on the meaning of the statutory language, while the Seventy-third Legislature had every authority to enact a definition that put an end to this Court's adventure in writing statutes.

I agree that we have a duty to interpret and apply that definition according to its language, which is clear. Only our obligations to uphold the constitutions could override that duty. There is no constitutional question in this case, in my view. But the statutory definition may be so inclusive as to invite constitutional problems.

For example, it is no rarity for suspects to attempt to flush controlled substances down the toilet. For that reason, officers who are executing a search warrant frequently assign one person to secure the bathroom immediately. I would hate to see this Court forced to hold the statute unconstitutional when a prosecutor tried to include all the water in the toilet bowl as part of the controlled substance.

But a prosecutor might. This case is before us today because a prosecutor tried to include the appellant's blood as part of the controlled substance. Whether that is what the statute *should* allow is a question for the legislature. I agree that, as it stands now, the statute does allow a prose-

cutor to do it, and the constitutions do not forbid it.

COCHRAN, J., dissenting, in which JOHNSON and HOLCOMB, JJ., joined

I respectfully dissent. I think that the court of appeals got it exactly right.[1] "Common sense often makes good law." [2] The evidence in this case showed that the blood-methamphetamine mixture in the vial found by appellant's bed is "waste" product. It is not a mixture in which adulterants or dilutants have increased the bulk of the controlled substance.

I think that the "plain language" of the statute is clear: only those adulterants and dilutants which increase the bulk of the controlled substance *before* their distribution, sale, or consumption are part of the gross weight of the controlled substance. Controlled substance detritus or left-overs may still exist *after* a person has used a controlled substance. The weight of any controlled substance detritus counts, but the medium in which the detritus is found is clearly not an adulterant or dilutant which increases the bulk of the controlled substance.

Chapter 481 of the Texas Health and Safety Code sets out the Texas Controlled Substances Act. This act provides higher penalties and longer sentences for those who manufacture, distribute, or possess a larger quantity of drugs.[3] The gravamen

---

1. *Seals v. State*, No. 05–03–01105–CR, 2004 WL 639678 (Tex.App.-Dallas, April 1, 2004) (not designated for publication). In its opinion, the court of appeals stated,

   The facts peculiar to the present case present us with the issue of whether blood that becomes mixed with methamphetamine when the methamphetamine is being injected is an adulterant or dilutant under the health and safety code. As a matter of logic, we conclude it is not. An adulterant or dilutant increases the bulk or quantity of the controlled substance. But we cannot stretch that definition to encompass every

   instance of a controlled substance being mixed with another substance, particularly after the controlled substance has been used.
   *Id.* at *5.

2. *Peak v. United States*, 353 U.S. 43, 46, 77 S.Ct. 613, 1 L.Ed.2d 631 (1957).

3. *See* TEX. HEALTH & SAFETY CODE §§ 481.112–481.122 (defining offenses and setting out penalties depending upon type and quantity of drug).

of the offense is the quantity of the usable drug, not its purity.[4] The federal Anti-Drug Abuse Act and the pertinent sentencing guidelines are structured in a similar manner.[5] As the Supreme Court has noted, "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the pure drug involved, is used to determine the length of the sentence."[6]

Under the market approach, the penalties for drug trafficking are "graduated according to the weight of the drugs in whatever form they [are] found-cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level."[7]

4. *See McGlothlin v. State*, 749 S.W.2d 856, 859–61 (Tex.Crim.App.1988) (judicially defining adulterants and dilutants before Legislature enacted statutory definition; noting that such materials "cut" a controlled substance and that Legislature intended to "broaden the offender's potential liability beyond the weight of the pure controlled substance" to include "cutting" agents which increase the bulk or quantity of the final product); *Smith v. State*, 737 S.W.2d 933, 937 (Tex.App.-Dallas 1987, pet.ref'd) (noting that definition of drug paraphernalia includes dilutants and adulterants which are used or intended for use "in cutting a controlled substance" and holding that Legislature could rationally "conclude that possession of greater amounts of controlled substances should be punished more severely than possession of lesser amounts. The greater the amount of illicit drugs possessed, the more likely use is widespread and delivery to others is intended, and the greater harm to society"). In 1994, the Legislature modified the holding in *McGlothlin* and a later case, *Cawthon v. State*, 849 S.W.2d 346, 349 (Tex.Crim.App.1992), to the extent that these cases required proof of: (1) the specific substance that was a dilutant or adulterant; (2) the relative amounts of dilutant or adulterant within a given mixture; or (3) intent that an adulterant or dilutant was added to increase the bulk of the drug. *See Isassi v. State*, 91 S.W.3d 807, 810 (Tex.App.-El Paso 2002, pet. ref'd). By enacting the statutory definition of "adulterant or dilutant," in its current wording, these three judicially-enforced prongs were eliminated. Tex. Health & Safety Code § 481.002(49) (eff. Sept. 1, 1994).

5. *See generally Chapman v. United States*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (discussing congressional purpose in enacting federal drug sentencing provisions based upon weight of drugs combined with cutting agents and carrier mediums).

6. *Id.* at 461, 111 S.Ct. 1919 (holding that the weight of the blotter paper used as the distribution medium for LSD is included in the weight of the drug for sentencing purposes). After the *Chapman* opinion, the Federal Sentencing Guidelines were amended to exclude the weight of the blotter paper for purposes of a mandatory minimum sentence. *See* 1995 U.S. Sentencing Guidelines Manual § 2D1.1, Amendment 488. Nonetheless, in *Neal v. United States*, 516 U.S. 284, 296, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996), the Supreme Court held that the controlling statute, 21 U.S.C. § 841(b)(1), required a sentencing court to take into account the actual weight of the blotter paper with its absorbed LSD, even though the guidelines required a different method of calculating the weight of an LSD mixture or substance.

7. *Chapman*, 500 U.S. at 460, 111 S.Ct. 1919; *see also United States v. Stewart*, 361 F.3d 373, 377–78 (7th Cir.2004) (applying market-oriented approach and holding that only usable or consumable mixtures or substances can be included in drug quantity); *United States v. Johnson*, 999 F.2d 1192, 1196 (7th Cir.1993) (stating that when a jar containing waste water and traces of cocaine was found by officers in a "crack house," the weight of the waste water did not serve as a dilutant, cutting agent, or carrier medium; "the waste water does not in any way increase the amount of drug available at the retail level. The liquid, with just a trace of cocaine base, is merely a by-product of the manufacturing process with no use or market value. The waste water is not ready for distribution at the wholesale or retail level because it will never be distributed at all. Under a market-oriented approach, when the mixture is not ingestible and therefore not marketable, there is no rational basis to a sentence based on the entire weight of a useless mixture") (footnote omitted); *United States v. Rolande-Gabriel*, 938 F.2d 1231, 1237 (11th Cir.1991) (noting that "[t]he entire weight of drug mixtures which are usable in the chain of distribution

The Supreme Court explained that "Congress clearly intended the dilutant, cutting agent, or carrier medium to be included in the weight of those drugs for sentencing purposes. Inactive ingredients are combined with pure heroin or cocaine, and the mixture is then sold to consumers as a heavily diluted form of the drug." [8]

The Texas Legislature, like Congress, was concerned with consumable drug mixtures, mixtures that will or have reached citizens on the streets.[9] Thus, the entire weight of drug mixtures which are usable in the chain of distribution are considered in determining the offense level.[10] How do we know that the Texas Legislature has implemented a market-based approach toward drug crimes? We look at the plain language of the statute. The weight of a drug consists of: (1) the controlled substance itself; and (2) any adulterants or dilutants. Adultants and dilutants are any material *"that increases the bulk or quantity of a controlled substance."*[11] If, in fact, the Legislature did not care whether a substance had the effect of increasing the wholesale or retail bulk of the drug, it would not have added this requirement.

It would simply have said that the weight of a drug consists of (1) the controlled substance itself; and (2) any material with which the drug is mixed or in which the drug is found, which would inevitably include even the wrapping material, the waste product, and any toxic remains.[12] There must have been a reason why the Legislature used language that the material must be one that increases the bulk of the drug itself. That clear reason is that the Legislature wanted to punish drug traffickers and users based upon the weight of the usable or salable product.[13] As further proof the legislative plain language meaning of dilutants and adulterants, Section 481.002(17)(F) includes, as drug paraphernalia,

> a dilutant or adulterant, such as quinine, hydrochloride, mannitol, inositol, nicotinamide, dextrose, lactose, or absorbent, blotter-type materials, *that is used or intended to be used to increase the amount or weight of or to transfer a controlled substance* regardless of whether the dilutant or adulterant diminishes the efficacy of the controlled substance.[14]

---

should be considered in determining a defendant's sentence").

**8.** *Chapman*, 500 U.S. at 460, 111 S.Ct. 1919.

**9.** *Id.* at 466, 111 S.Ct. 1919; *McGlothlin*, 749 S.W.2d at 860–61.

**10.** *McGlothlin*, 749 S.W.2d at 861; *see Rolande–Gabriel*, 938 F.2d at 1237.

**11.** Tex. Health & Safety Code § 481.002(49) (emphasis added).

**12.** Alternatively, it could have used the same language as in the federal statute defining drug offenses (as opposed to the language in the sentencing guidelines): manufacture, distribution, or possession of "a mixture or substance containing a detectable amount of" the illicit drug. 21 U.S.C. § 841(b).

**13.** *See McGlothlin*, 749 S.W.2d at 860–61.

**14.** Tex. Health & Safety Code § 481.002(17)(F) (emphasis added). Normally, all parts of an act are construed together and the meaning of statutory terms within a single act remain the same when used throughout that act. *See, e.g., Texas Dept. of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002) ("In ascertaining a term's meaning, courts look primarily to how that term is used throughout the statute as a whole. Statutory terms should be interpreted consistently in every part of an act") (citations omitted); *see also Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 723 (5th Cir.2004) ("Texas courts must interpret statutory terms consistently"); *Brown v. Darden*, 121 Tex. 495, 500, 50 S.W.2d 261, 263 (Tex. 1932) ("Whenever a legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense, unless there be something in the

Although this statutory list does not purport to be exhaustive, all of the substances listed are cutting agents or agents used to facilitate the delivery or use of drugs.[15] They may diminish the strength or efficacy of the drug, but they do not pollute it or make it unusable or unmarketable.

It would be irrational, however, to consider unusable, unmarketable, toxic, or waste material as an adulterant or dilutant that increases the bulk of the controlled substance.[16] By definition, the waste product is what is left over after the drug has been manufactured, delivered, or consumed. It is function, not form, that counts. An adulterant or dilutant functions as an aid to drug distribution or use, not as a dangerous deterrent to a drug's consumption.

In this case, there is no evidence of any illicit use of the bloody mixture in the vial with traces of methamphetamine contained in it. Both police officers testified that blood is not an adulterant or dilutant. Both officers testified that blood does not increase the bulk or quantity of methamphetamine.[17] Their opinions are eminently

context or the nature of things to indicate that it intended a different meaning thereby.") (citations omitted); *Guthery v. Taylor*, 112 S.W.3d 715, 721–22 (Tex.App.-Houston [14th Dist.] 2003, no pet.) ("when construing a statutory word or phrase, a court may take into consideration the meaning of the same or similar language used elsewhere in the act or in another act of similar nature. When the same or a similar term is used in the same connection in different statutes, the term will be given the same meaning in one as in the other, unless there is something to indicate that a different meaning was intended.") (citations omitted).

I am at a loss to understand why, when the term "adulterant or dilutant" is used in the drug paraphernalia statute it means substances "used or intended to be used to increase the amount or weight of or to transfer a controlled substance," it is limited to materials that assist in the distribution, transfer, and use of a controlled substance, but when materials are found *with* a controlled substance, that same term, in the same statutory act, includes toxic waste products that no one would use to increase the amount or weight of a controlled substance. As Alice in Wonderland was wont to say, "Curiouser and curiouser."

**15.** *See McGlothlin,* 749 S.W.2d at 860–61.

**16.** *See, e.g., United States v. Rolande–Gabriel,* 938 F.2d 1231, 1237 (11th Cir.1991) (irrational to consider entire weight of cocaine mixture that was obviously unusable while mixed with liquid waste material); *United States v. Acosta,* 963 F.2d 551, 554–55 (2d Cir.1992) (evidence was that cocaine was dissolved in creme liqueur for importation; "under a market-oriented approach, when the mixture is not ingestible (and therefore not marketable), there is no reason to base a sentence on the entire weight of a useless mixture"); *United States v. Rodriguez,* 975 F.2d 999, 1007 (3d Cir.1992) (excluding weight of unusable and toxic boric acid from packages containing boric acid and a thin layer of cocaine); *United States v. Robins,* 967 F.2d 1387, 1389 (9th Cir.1992) (excluding weight of cornmeal combined with cocaine; cornmeal was not a "tool of the trade" or a cutting agent, and it did not facilitate the distribution of the cocaine); *United States v. Brinton,* 139 F.3d 718, 722 (9th Cir.1998) (2,401 grams of unmarketable and toxic waste product containing some usable methamphetamine could not be included in total weight of controlled substance for sentencing purposes; only the usable methamphetamine should be used in calculating sentence); *United States v. Ochoa–Heredia,* 125 F.Supp.2d 892, 927 (N.D.Iowa 2001) (when 26.2 grams of methamphetamine was mixed with 3,000 grams of toxic freon "waste," only the weight of the methamphetamine could be considered; court concluded that "unusable, unmarketable, or toxic mediums containing methamphetamine should be excluded from calculation of the weight of the methamphetamine for purposes of determining mandatory minimum sentences").

**17.** A criminalist testified that he frequently found blood in used syringes along with contraband, but he expressed no opinion as to what possible use such blood might be in the manufacture, delivery, or use of any contraband.

reasonable. And I am unaware of any "real-life" case or example in which someone's blood is mixed with methamphetamine prior to its distribution or use. To do so would create a serious health hazard: Hepatitis B and HIV/AIDS are but two reasonably foreseeable results.[18] It is also reasonably common knowledge that coagulated blood in one's veins causes fatal embolisms. Indeed, were Jonathon Swift still with us, a new "Modest Proposal"[19] might be to legalize all illicit drugs, but require them to be mixed with someone's blood before being sold and distributed. That might put a swift end to drug trafficking and users alike.

In this case, appellant testified that the bedside vial contained some of his own blood because he had attempted to inject methamphetamine, but was unable to find a vein and blood backed up into the syringe. He stated that he discarded the blood into the vial. As the court of appeals noted, "[t]he jury was provided no other explanation for the blood in the vial,"[20] and it could think of no other rational explanation. Neither can I.

The State argues that the mere fact that appellant still had the vial is evidence that he must have considered the bloody mixture of some use. Well, if one considers a used, wadded up Kleenex lying on the bedside table of some value—just as this bloody vial was lying beside used and clean syringes on the bedside table—perhaps that is within the realm of possibility. But just barely.

The State also argues that because appellant kept drug scales next to the tin container, "a rational jury could have determined that Seals placed everything he needed to use methamphetamine in and around that kit—clear evidence that he was keeping the vial and contents for future use." Perhaps so, if he wanted to commit suicide—death by injection with toxic, coagulated blood. Finally, the State argues that because appellant failed to tell the police officers at the scene that the vial "was filled with unusable waste product," it must have been usable. I cannot follow this logic.

However, if one does follow the State's *legal* logic, then the following scenarios would lead to the equally absurd results:

- The defendant swallows a hit of LSD as his Thanksgiving Day dessert. He promptly vomits up his entire Thanksgiving Day dinner. The weight of the Thanksgiving dinner is included as an adulterant and dilutant;

- The defendant appears for a urine drug test; his product is prodigious. It includes a trace amount of methamphetamine. The weight of the urine is included as an adulterant and dilutant.

One federal court has satirically noted the following examples: When the police race into a defendant's home, and he is in the process of flushing a rock of cocaine down the toilet, all of the water in the toilet bowl is included in the weight calculation; when a defendant is arrested for growing marijuana in his back yard, all of the plowed-under soil in the backyard is included because it still contains traces of marijuana roots, shoots, and leaves in it.[21]

18. It is common knowledge that both Hepatitis B and HIV/AIDS can be spread by blood-to-blood contact.

19. *See* Jonathon Swift, *A Modest Proposal For Preventing the Children of Poor People in Ireland From Being a Burden to Their Parents or Country, and For Making Them Beneficial to* *the Public* (1729) (satirical essay suggesting that the Irish should eat their own children).

20. *Seals,* 2004 WL 639678 at *2.

21. *See United States v. Johnson,* 999 F.2d 1192, 1196 (setting out both the toilet bowl example and the plowed-marijuana fields

The Dallas court of appeals in this case used an apt example of a defendant discarding cocaine residue in a pile of ashes; under the State's logic, the entire pile of ashes (six inches high or twenty feet high) would constitute an "adulterant or dilutant." [22] Oh, surely not!

The issue in all of these examples is simple: Does the Texas Controlled Substances Act "require that the weight of an unusable portion of a mixture, which makes the drugs uningestible and unmarketable, be included in the overall weight calculation?" Like so many federal courts,[23] I think not.

It simply defies common sense (and perhaps the federal constitution)[24] to think that if appellant had possessed slightly less than one gram of injectable methamphetamine, he should be sentenced to a state jail felony, but if he unsuccessfully tried to inject that drug into his veins and his blood backed up into the syringe, mixing three grams of his blood with the methamphetamine, he may be sentenced to a third degree felony. He may be criminally inept, but that is not a felony. Normally, courts "do not interpret a statute in a manner that will lead to a foolish or absurd result when another alternative is available." [25] We should not do so this time, particularly if doing so raises constitutional concerns.

I must respectfully dissent.

hypothetical as leading to "absurd and irrational results contrary to congressional intent").

**22.** *Seals,* 2004 WL 639678 at *1–2.

**23.** *See United States v. Acosta,* 963 F.2d 551, 553 (2d Cir.1992) (concluding that "the creme liqueur must be separated from the cocaine before the cocaine may be distributed, it is not unreasonable to consider the liquid waste as the functional equivalent of packaging materials ... which quite clearly is not to be included in the weight calculation"); *Chapman, Stewart, Rolande–Gabriel, Johnson, Brinton, Rodriguez, Robins, Ochoa–Heredia, supra.* Though the vast majority of federal courts have followed a "market oriented" approach to drug weight, not all have done so. *See, e.g., United States v. Mahecha–Onofre,* 936 F.2d 623, 624–26 (1st. Cir.1991) (when defendant was found in possession of two suitcases that were manufactured of an acrylic material into which 2.5 kilograms of cocaine were chemically bonded, the court held that the entire weight of the suitcases, less the weight of the metal components, was the appropriate sentencing consideration under U.S.S.G. § 2D1.1 and 21 U.S.C.

§ 841(b)(1)(A)); *United States v. Restrepo–Contreras,* 942 F.2d 96, 99 (1st Cir.1991) (entire weight of statues made of beeswax-cocaine mixture included for calculation of base offense level); *United States v. Walker,* 960 F.2d 409, 412 (5th Cir.1992) (entire weight of substance, most of which was waste, that contained a detectable amount of methamphetamine could be used to calculate defendants' base offense levels for sentencing); *compare United States v. Palacios–Molina,* 7 F.3d 49, 53 (5th Cir.1993) (distinguishing *Walker* which dealt with by-products of methamphetamine manufacturing process from instant case in which bottle of sangria was used to conceal cocaine; holding that sangria did not increase bulk of cocaine and would not be part of the retail or wholesale distribution of cocaine, thus liquid sangria was not adulterant or dilutant for sentencing purposes).

**24.** Appellant, as the prevailing party in the lower court, did not challenge the constitutionality of this statute, and thus we need not address that issue in today's case.

**25.** *Dallas Morning News Co. v. Board of Trustees,* 861 S.W.2d 532, 535 (Tex.App.-Dallas 1993).