ACCEPTED
01-14-00901-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
5/29/2015 3:27:39 PM
CHRISTOPHER PRINE
CLERK

## No. 01-14-00901-CR

### In The Court of Appeals
### For the First District of Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

5/29/2015 3:27:39 PM
CHRISTOPHER A. PRINE
Clerk

### Travis Lamb
*Appellant*

v.

### the State of Texas
*Appellee*

On Appeal from Cause No. 1394200
From the 351st Judicial District Court of Harris County, Texas

### Appellant's Brief

**Oral Argument Requested**

**Alexander Bunin**
Chief Public Defender
Harris County, Texas

**Nicolas Hughes**
Assistant Public Defender
Harris County, Texas
TBN: 24059981
1201 Franklin St., 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax:    (713) 437-4316
nicolas.hughes@pdo.hctx.net

**Attorney for Appellant**

## IDENTITY OF PARTIES AND ATTORNEYS

APPELLANT:                                     TRAVIS LAMB

TRIAL PROSECUTOR:                    KRISTIN ASSAD  
Assistant District Attorney  
Harris County, Texas  
1201 Franklin Street, 6th Floor  
Houston, Texas 77002

ATTORNEY AT TRIAL:                   KEITH LARSON  
Attorney at Law  
2855 Mangum Road, Suite A-559  
Houston, Texas 77092-7493

JUDGE AT TRIAL:                        HON. MARK KENT ELLIS  
351st District Court  
Harris County, Texas  
1201 Franklin Street, 14th floor  
Houston, Texas 77002

ATTORNEY ON APPEAL:                NICOLAS HUGHES  
Assistant Public Defender  
Harris County, Texas  
1201 Franklin St., 13th Floor  
Houston, Texas 77002

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND ATTORNEYS ........................................................................ ii

TABLE OF CONTENTS .................................................................................................. iii

INDEX OF AUTHORITIES ............................................................................................... v

STATEMENT OF THE CASE ............................................................................................ 1

STATEMENT REGARDING ORAL ARGUMENT .................................................................. 1

ISSUE PRESENTED ....................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 1

SUMMARY OF ARGUMENT ............................................................................................ 3

ARGUMENT ................................................................................................................. 5

    I. Issue One: There is insufficient evidence that Travis Lamb knowingly possessed the cocaine purported detected in the crystalline substance .............. 5

        A. The elements and proof required to support a conviction for possession of a substance in penalty group 1, $\geq$ 1 gram and $<$ 4 grams (cocaine) ........................................................................................................ 5

        B. Standard of review ................................................................................. 6

        C. The portions of the record relevant to the determination of whether Travis Lamb knew the substance in his possession was cocaine .............. 7

            1. The observations of the police officers ...................................... 7

            2. Travis Lamb's contemporaneous statement about the nature of the crystalline substance ................................................................... 8

            3. Analyst Noyola's testimony about the crystalline substance ...... 8

D. Analysis ......................................................................... 14

1. Analyst Noyola's conclusions are insufficient to support a conviction for possession of substance in penalty group 1, ≥ 1 g. and < 4 g (cocaine) ........................................................... 14

2. There is no evidence which proves that Travis Lamb intentionally or knowingly possessed *cocaine* .................................... 15

E. The current legal standards employed in drug possession cases are unworkable .................................................................................. 22

1. A law that makes criminals out of us all .................................... 22

2. There is no minimum amount of a controlled substance required for conviction under Section 481.115 of the Health and Safety Code and anything mixed with the controlled substance can be considered an "adulterant or dilutant" ................................. 23

3. Ignorance is bliss: why a little bit of knowledge is a bad thing under Section 481.115 of the Health and Safety Code ................. 24

4. A new rule must be crafted .......................................................... 27

PRAYER ....................................................................................................... 28

CERTIFICATE OF SERVICE ............................................................................. 29

CERTIFICATE OF COMPLIANCE ...................................................................... 29

APPENDIX .................................................................................................... 30

# INDEX OF AUTHORITIES

## Federal Cases

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................................ 15

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................................ 6

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ........................................ 27

*United States v. Stevens*, 559 U.S. 460 (2010) ........................................................ 28

*United States v. U.S. Currency, $30, 060.00*, 39 F.3d 1039 (9th Cir. 1994) ........................ 25

## State Cases

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) ........................................ 20

*Chavez v. State*, 769 S.W.2d 284 (Tex. App.-Houston [1st Dist.] 1989) .................... 16

*City of San Antonio v. Pollock*, 284 S.W.3d 809 (Tex. 2009) ................................ 15

*Curtis v. State*, 548 S.W.2d 57 (Tex. Crim. App. 1977) .................................... 19, 20

*Daniels v. State*, 853 S.W.2d 749 (Tex. App.−Houston [1st Dist.] 1993, no pet.) .......... 23

*Deshong v. State*, 625 S.W.2d 327 (Tex. Crim. App. 1981) ........................................ 6

*Joseph v. State*, 897 S.W.2d 374 (Tex. Crim. App. 1995) ................................ 22, 23, 27

*King v. State*, 895 S.W.2d 701 (Tex. Crim. App. 1995) ..................................... passim

*Seals v. State*, 187 S.W.3d 417 (Tex. Crim. App. 2005) ..................................... passim

*Shults v. State*, 575 S.W.2d 29 (Tex. Crim. App. 1979) .................................... 17, 21

*Whitelaw v. State*, 29 S.W.3d 129 (Tex. Crim. App. 2000) ........................................ 28

## State Statutes

TEX. CODE CRIM. PROC. ANN., art. 38.35 (2011) ..................................................... 14, 20

TEX. HEALTH & SAFETY CODE ANN. § 481.115 (West 2011). ................................... 22, 24, 28

TEX. PENAL CODE ANN. § 6.03 (West 2011) ................................................................26

**Other Authorities**

Christian G. Daughton, *Illicit Drugs: Contaminants in the Environment and Utility in Forensic Epidemiology*, 210 REV. OF ENVIRON. CONTAMINATION AND TOXICOLOGY 59 (2011) ...................................................................................................................................26, 27

David Biello, *Cocaine Contaminates Majority of U.S. Currency*, SCIENTIFIC AMERICAN (August 16, 2009) ...................................................................................................21

*Drug Fact Sheet: Bath Salts or Designer Cathinones*, DEA *available at* http://www.dea.gov/ druginfo/drug_data_sheets/Bath_Salts.pdf.................................................................15

Eric Lavins, *Cannabis (Marijuana) Contamination of United States and Foreign Paper Currency*, 28 J. ANALYTICAL TOXICOLOGY 439 (2004)....................................................................25

Henry C. Lee, *Forensic Science and the Law*, 25 CONN. L. REV. 1117 (1993) ..............10, 12

Jill Gallus, *Synthetic Cocaine Sold As Legal Substitute To Real Drug*, KVIA (Jun. 26, 2012) ...................................................................................................................................16

Karen Miotto, et al.,*Clinical and pharmacological aspects of bath salt use: A review of the literature and case reports*, 132 DRUG ALCOHOL DEPEND. 1 (2013) ................................16

*Lab 5: Gas Chromatography/Mass Spectrometry (GC/MS)*, U.C. Davis *available at* http://chemwiki.ucdavis.edu/Wikitexts/ UC_Davis/UCD_Chem_115_Lab_Manual/Lab_5%3A_Gas_Chromatography_Ma ss_Spectrometry_%28GSMS%29..............................................................................11

P.E. Stackelerg et al., *Persistence of pharmaceutical compounds and other organic wastewater contaminants in a conventional drinking-water-treatment plant*, 324 SCIENCE OF THE TOTAL ENVIRONMENT 99 (2004) ...................................................................................26

*Rapid Testing Methods of Drugs of Abuse*, UNITED NATIONS OFFICE ON DRUGS AND CRIME (1994)...............................................................................................................9

*Recommended methods for the Identification and Analysis of Cocaine in Seized Materials*, UNITED NATIONS OFFICE ON DRUGS AND CRIME (March 2012) .......................... 10, 11, 13, 18

Richard Sleeman et al., *Drugs on Money*, 72 ANALYTICAL CHEM. 397 (2000).................21

*Synthetic 'Bath Salts' An Evolving Problem For DEA,* NPR (Jun. 30, 2012) .......................16

## STATEMENT OF THE CASE

Travis Lamb was arrested for possession of substance in penalty group 1 , ≥ 1 g. and < 4 g (methamphetamine) on July 11, 2013 and was indicted for possession of substance in penalty group 1 , ≥ 1 g. and < 4 g (cocaine) on September 26, 2013. (C.R. at 6, 14). On October 28, 2014, Travis Lamb was convicted of possession of substance in penalty group 1 , ≥ 1 g. and < 4 g (cocaine) after a jury trial and was sentenced to 35 years in prison. (C.R. at 76). Travis Lamb appeals from the conviction in his case.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is necessary to help explain why a laboratory analysts's testimony that laboratory tests "tested positive" for a controlled substance cannot support a conviction without foundational support and to explain the unintended and unconsidered consequences of allowing convictions for trace amounts of drugs, and how trace amounts of drugs combine with "adulterants and dilutants" in everyday life.

## ISSUE PRESENTED

There is insufficient evidence that Travis Lamb knowingly possessed the cocaine purported detected in the crystalline substance

## STATEMENT OF FACTS

On June 10, 2013, Officers Perez and Gallegos saw a truck turn left from Hartsville Road onto Donegal Way. (4 R.R. at 10-11). According to the officers, the driver of the truck failed to signal the left turn. (4 R.R. at 11). The officers turned on

1

their overhead lights and pulled the truck over. (4. R.R. at 11). Inside the truck were Travis Lamb, the driver, and his wife Katrissa Lamb. (3 R.R. at 29-30; 4 R.R. at 13-14). Officer Perez asked Mr. Lamb for his driver's license and proof of insurance. (4 R.R. at 12-13). When Officer Perez realized that Travis Lamb did not have a driver's license, Officer Perez placed Mr. Lamb under arrest and placed him in the patrol car. (4 R.R. at 13, 16).

After Travis Lamb was arrested, officers determined that Mr. Lamb's passenger, Katrissa Lamb, did not have a valid license. (4 R.R. at 14). At this point, officers decided to tow the truck and performed a slapdash search for contraband which the officers deemed an inventory search. (4 R.R. at 15). During the search of the truck, Officers found a small plastic bag of crystalline substance which resembled methamphetamine in the driver's side door panel. (3 R.R. at 19-20; 4 R.R. at 32-34). The officers took the crystalline substance back to the patrol car in order to perform a presumptive field test for methamphetamine. (3 R.R. at 20; 4 R.R. at 33-34). According to both officers, Travis Lamb overheard the conversation about the crystalline substance between the officers from inside the patrol car and said, "[i]t's not meth, it's bath salts." (4 R.R. at 17, 40). According to the officers, the crystalline substance returned "a positive result for meth." (4 R.R. at 16). Mr. Lamb was booked on charges of possession of methamphetamine and the crystalline substance was submitted to a narcotics control center. (4 R.R. at 23, 35).

2

The analyst assigned to test the crystalline substance, Angelica Noyola, weighed the substance and then performed several tests on the substance. In order, Analyst Noyola performed a presumptive chemical test (negative), an ultraviolet/visible spectrophotometry test (negative), a fourier transform infrared spectroscopy (no acceptable match), and a gas chromatography / mass spectrometry (negative). (4 R.R. at 63-65). Analyst Noyola concentrated the sample and performed a second round of tests. (4 R.R. at 65). Analyst Noyola performed a second gas chromatography test, which indicated that the substance "contains cocaine," and performed thin layer chromatography, which presumptively indicated the presence of cocaine. (4 R.R. at 65-66). Upon receipt of the lab report, Travis Lamb was ultimately indicted and convicted of possession of substance in penalty group 1, $\geq$ 1 g. and < 4 g (cocaine). (C.R. at 14, 75).

## SUMMARY OF ARGUMENT

The arc of this case is confusing and takes an unexpected turn. Police officers believed the crystalline substance involved this case to be methamphetamine, Travis Lamb believed the crystalline substance in this case to be "bath salts," and Analyst Noyola conceded that the crystalline substance was not powder or crack-cocaine and that the substance did not test positive for controlled substances on four separate tests. Though nothing indicated that the crystalline substance contained a controlled substance at this point, Analyst Noyola concentrated the crystalline substance and unexpectedly detected cocaine in the sample. There is no evidence that the cocaine

3

detected in the sample was anything more than a trace amount of cocaine, and there is no evidence to prove that the defendant could or should have known that the substance in his possession contained cocaine. No reasonable person would have seen the irregular, translucent white crystals involved in this case and thought, "surely, this is cocaine."

Additionally, the State failed to provide any of the foundational data supporting Analyst Noyola's conclusion that the crystalline substance contained cocaine. For example, the State should have offered the chromatograms and the mass spectra for the sample and the library standards, which would serve as the basis of laboratory analysis. The testimony of a laboratory analyst is necessary to support a conviction for possession of any crystalline substance which cannot be simply visually distinguished from other chemicals. Analyst Noyola's testimony, by itself the bare assertions of an expert (*ipse dixit*) and without evidentiary value, fails to supply the necessary confirmation of the nature of the substance analyzed in this case.

Finally, even if this Court can look beyond the evidentiary problems in this case, this Court should address problems inherent in the interpretation of Section 481.115 of the Texas Health & Safety Code. The way the current law is drafted, a person who knows that some item or substance that the person possesses is contaminated with a trace amount controlled substance, that person is guilty of an offense, regardless whether that contamination is intentional, unwanted, or the result of forces beyond the person's control. Furthermore, the entire bulk of the

4

contaminated substance (for example, a glass of water) may be aggregated and used to inflate a person's punishment. This Court should address the problems inherent with permitting a person's conviction for an invisible, unmeasurable amount of controlled substance and then inflating that offense by deeming whatever medium the controlled substance is found within an "adulterant or dilutant." Travis Lamb's conviction should not stand merely because of the unforeseen detection of cocaine from the sample in this case.

**ARGUMENT**

**I. ISSUE ONE: There is insufficient evidence that Travis Lamb knowingly possessed the cocaine purported detected in the crystalline substance**

**A. The elements and proof required to support a conviction for possession of a substance in penalty group 1, ≥ 1 gram and < 4 grams (cocaine)**

The standard of proof required for conviction of possession of a drug designated as penalty group 1 within the Texas Controlled Substances Act varies depending on several factors:

> In order to establish the unlawful possession of a controlled substance, the State must prove two elements: (1) that the accused exercised care, control and management over the contraband, and (2) that the accused knew that the matter possessed was contraband.
> [...]
> When the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are

5

additional independent facts and circumstances which affirmatively link the accused to the contraband.

*Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981). Additionally:

[W]hen the quantity of a substance possessed is so small that it cannot be measured, there must be evidence other than mere possession to prove that the defendant knew the substance in his possession was a controlled substance. Therefore, the State must prove, through other evidence, that appellant had knowledge that the substance in his possession was cocaine.

*King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995).

## B. Standard of review

The standard of review for the sufficiency of the evidence supporting for a conviction for possession of a drug within penalty group 1 is the *Jackson v. Virginia* standard. *King v. State*, 895 S.W.2d at 703. Under that standard,

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.

*Jackson v. Virginia*, 443 U.S. 307, 318–319 (1979) (citations omitted).

**C. The portions of the record relevant to the determination of whether Travis Lamb knew the substance in his possession was cocaine**

### 1. The observations of the police officers

**Q. (By the prosecution)** What did that substance look like?
**A. (By Officer Perez)** It was a white crystal powder, crystallized powder.
**Q.** Based on your experience as a police officer on the Gang Task Force, what did that substance look like to you?
**A.** To me, I believed it to be meth.
**Q.** And did you or your partner conduct what's called a field test?
**A.** Yes, my partner conducted the field test.
**Q.** What were the results of those -- of that field test?
**A.** We got a positive result for meth.
**Q.** And what does that mean to you?
**A.** It means -- to me it means with what I have available, that it determines that it is, in fact, meth.
**Q.** And did you also field-test it for cocaine?
**A.** I did not.

(4 R.R. at 15-16).

**Q. (By the prosecution)** And after the search was concluded, did you then make a decision about what field test to use for this substance?
**A. (By Officer Gallegos)** Yes. Throughout my inventory, I kept care, custody, and control of the substance. Then I met with my partner and we determined what we believed the substance was and which test that we would use.
[…]
**Q.** Based on your experience, what did the substance look like to you?
**A.** Due to its crystal formation, we believed it to be methamphetamine.
**Q.** And then what field test did you use?
**A.** We used the meth tester.
**Q.** Did the test come back positive or negative?
**A.** Came back positive.
**Q.** Once you got a positive field test for a controlled substance, did you then conclude your field test?
**A.** Yes.
**Q.** Did you test the substance for another controlled substance, for example, cocaine?

7

A. No, ma'am, I didn't.

(4 R.R. at 33-34).

**2. Travis Lamb's contemporaneous statement about the nature of the crystalline substance**

According to both officers, when Travis Lamb realized that the officers had seized the crystalline substance and were testing the substance, Travis Lamb stated "It's not meth, it's bath salts." (4 R.R. at 17, 40). Officer Perez testified that bath salts were synthetic drugs that had been available for public sale at gas stations and smoke shops, but had been since been banned as illegal (4 R.R. at 17, 26).

**3. Analyst Noyola's testimony about the crystalline substance**

**a. The physical properties of the crystalline substance**

Analyst Noyola provided limited testimony about the physical properties of the crystalline substance. On the lab report, Analyst Noyola described the evidence as a "crystalline substance" and noted a weight of 1.77 grams. (7 R.R. at State's Exhibit 5). During testimony, Analyst Noyola repeatedly described the evidence as a "crystalline substance." (4 R.R. at 60-61, 63, 65-66, 71-72). Analyst Noyola explained,

> **Q. (By the prosecution)** Is cocaine -- does cocaine come in a powder form?
> **A. (By Analyst Noyola)** Cocaine can come in different forms. It can come in a powder form. I've seen it in a liquid form. I've seen it in a chunk substance, or commonly known as crack cocaine. It can come in any form. If there's a bunch of adulterants and dilutants, it will probably take the form of the adulterants and dilutants.
> **Q.** What do you mean by that?

8

**A.** That, you know, for example, I've seen cocaine in water, in liquid. So the adulterants could be the liquid because it's adding to the cocaine weight.

**Q.** And in this case, a crystalline substance, you're saying that cocaine can take the appearance of the adulterants and dilutants?

**A.** Not cocaine, the compound, but other adulterants and dilutants can interfere. We normally see cocaine in powder or in chunk, but like I stated, I've seen it in other forms as well. I've seen it in liquid, I've seen it in gooey, sticky forms or substances.

(4 R.R. at 75-76).

### b. The first series of chemical analyses performed on the crystalline substance

### i. Marquis Reagent

Analyst Noyola performed a series of laboratory tests on the crystalline substance. Analyst Noyola first performed a Marquis Reagent test, a presumptive chemical test which can indicate the presence of amphetamine compounds. (4 R.R. at 63). The Marquis Reagent test is designed to detect amphetamines (like methamphetamine), but should not test positive for cocaine. *Rapid Testing Methods of Drugs of Abuse*, UNITED NATIONS OFFICE ON DRUGS AND CRIME 42-45 (1994). The Marquis Reagent test "came back negative." (4 R.R. at 63). There is no record-based explanation of why the police claimed that the substance field-tested positive for methamphetamine but why the laboratory analysis did not.

### ii. Spectrometry (UV-Vis, FTIR)

Analyst Noyola then performed a second test using an UV spectrophotometer. (4 R.R. at 64). Broadly speaking, spectroscopy is the study of the interaction of

electromagnetic radiation, such a light, ultraviolet radiation, or infrared radiation, and its interaction with matter. *See* Henry C. Lee, *Forensic Science and the Law*, 25 CONN. L. REV. 1117, 1120 n. 9 (1993). UV-Vis spectroscopy can help identify an unknown substance by determining the absorption of different wavelengths of ultraviolet and visible (light) radiation by molecular bonds in the substance. *Id.* Cocaine shows characteristic absorption peaks when tested by UV-Vis Spectroscopy. *Recommended methods for the Identification and Analysis of Cocaine in Seized Materials*, UNITED NATIONS OFFICE ON DRUGS AND CRIME 35 (March 2012). According to Analyst Noyola, the ultraviolet/visible spectrophotometer results "were negative [for any controlled substance] as well." (4 R.R. at 64).

Analyst Noyola performed a third test by placing a sample in a FTIR spectrometer. (4 R.R. at 64). FTIR is a confirmatory test that can identify an unknown substance by determining the absorption of different wavelengths of infrared radiation by molecular bonds in a substance, then mathematically processing (by computing the Fourier transform of the absorption spectra) the results into a more usable format. *See Forensic Science and the Law* at n. 10; (4 R.R. at 64). Unequivocal identification of cocaine is possible by FTIR spectroscopy. *Recommended methods for the Identification and Analysis of Cocaine in Seized Materials* at 35. According to Analyst Noyola, "the results [of the FTIR spectrometer] were not an acceptable match" when compared to the internal library of controlled substances, meaning that no controlled substances were detected by FTIR. (4 R.R. at 64).

### iii. The first GC/MS test

The fourth laboratory test performed by Analyst Noyola was gas chromatography / mass spectrometry. (4 R.R. at 65). A gas chromatograph separates a mixture into its components as the components flow through the instrument and interact with stationary components of the instrument to varying degrees, exiting the instrument at different, characteristic times. *Lab 5: Gas Chromatography/Mass Spectrometry (GC/MS)*, U.C. Davis *available at* http://chemwiki.ucdavis.edu/Wikitexts/ UC_Davis/UCD_Chem_115_Lab_Manual/Lab_5%3A_Gas_Chromatography_Mass _Spectrometry_%28GSMS%29. The separated components are then ionized and measured by the mass spectrometer to determine the components' molecular mass. *Id.* The GC/MS is a commonly used and highly specific technique that provides a confirmatory result. (4 R.R. at 65); *Recommended methods for the Identification and Analysis of Cocaine in Seized Materials* at 29. The GC/MS test can detect cocaine in a sample. *Id.* at 29-30. The GC/MS test "came out to be negative [for any controlled substance]."

### c. The second series of chemical analysis performed on the crystalline substance

### i. Concentration procedure

After three tests produced negative results and one test produced an inconclusive result, Analyst Noyola increased the concentration of the test sample: "I added more sample, concentrated it more." (4 R.R. at 65). Analyst Noyola testified that it was part of the lab's procedure to concentrate the sample and to re-test:

11

**Q. (By the prosecution)** And is it part of the lab's policy and procedure to add or concentrate the amount to determine whether a controlled substance exists?

**A. (By Analyst Noyola)** It's part of the procedure, yes, on the GCMS portion part of the test, yes.

**Q.** And that's what you did in this case?

**A.** Right. If we were to get a negative Spectra, basically there's no retention times or peaks on our chromatograph, then our next -- according to SOP's procedures, we would add more sample and then run it again on the GCMS.

(4 R.R. at 72).

### ii. The second GC/MS test

The second time the GC/MS instrument was run with the concentrated sample (Analyst Noyola's fifth test of the substance), the instrument detected cocaine:

**Q. (By the prosecution)** And what were the results of your analysis of the substance in this case?

**A. (By Analyst Noyola)** It contains cocaine.

(4 R.R. at 66).

### iii. Thin layer chromatography

The final test performed by Analyst Noyola was thin layer chromatography. Thin layer chromatography is a separation technique, like gas chromatography, and involves determining how a sample moves through solvents passing over a solid adsorbent coating on a plate. *See Forensic Science and the Law* at n. 2. Thin layer chromatography is a presumptive test which can be used to help identify cocaine. (4 R.R. at 66); *Recommended methods for the Identification and Analysis of Cocaine in Seized*

12

*Materials* at 26-29. According to Analyst Noyola, the thin layer chromatography test "came positive for cocaine."

### d. The critical gaps in Analyst Noyola's testimony

#### i. There is no record-based reason for a juror to conclude that there was anything more than a trace amount of cocaine detected in the crystalline substance

Analyst Noyola did not provide any testimony which would help a trier of fact determine the amount of cocaine detected in the sample. The first series of chemical analyses produced three negative results and one inconclusive result. (4 R.R. at 62-65). There is no testimony about the level of concentration of sample in the second series of tests or the limitations of the GC/MS and thin layer chromatography tests. Analyst Noyola performed no quantitative analysis, or analysis of the *amount of cocaine* present in the sample. Analyst Noyola noted that the sample did not appear to be cocaine, but was in the form of the "adulterants and dilutants" in the compound. (4 R.R. at 74). There was no evidence suggesting that a person viewing the crystalline substance would have any reason to believe it contained cocaine, no evidence suggesting that cocaine was detected at anything more than a trace level, or that the cocaine detected was anything other than contamination.

13

**ii. Analyst Noyola's testimony consisted of bare conclusions unsupported by foundational data**

Analyst Noyola did not provide any of the foundational knowledge required to reach the conclusion that the crystalline substance in this case contained cocaine. Analyst Noyola did not provide the data from the GC/MS, namely the chromatograph (indicating when substances passed through the instrument), the mass spectra (indicating the molecular weight of the substances passing through the instrument), or any of the data of the reference cocaine sample for comparison. Analyst Noyola did not provide any images of the thin layer chromatography plates of the sample or the reference, nor any analysis comparing the two plates/images. The single page "laboratory report" is simply the conclusion Analyst Noyola arrived at without any supporting documentation. The jury simply did not have the foundational knowledge necessary to conclude that the crystalline substance contained cocaine. The jury was required to assume upon nothing more than Analyst Noyola's insistence that the results of the tests matched the reference standards for cocaine.

**D. Analysis**

**1. Analyst Noyola's conclusions are insufficient to support a conviction for possession of substance in penalty group 1, ≥ 1 g. and < 4 g (cocaine)**

Analyst Noyola's testimony was necessary to prove that Travis Lamb possessed cocaine. *See* TEX. CODE CRIM. PROC., art. 38.35(d)(1). As Analyst Noyola's testimony

14

consisted of conclusions without any supporting facts or data, it cannot support the verdict. *See e.g. City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) (Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence). Without any of the details of the specific analysis Analyst Noyola performed in this case, much less the foundational data reported by the laboratory instruments, there is simply no basis for Analyst Noyola's expert opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (expert opinion must have some connection to data). While it may be perfectly reliable for a witness to base her expert opinion on the nature of a substance by performing GC/MS or thin layer chromatography analysis, such reliability can only be established when the foundational support of the results of the analysis is furnished along with the witness testimony. Analyst Noyola's unsupported claim that the crystalline substance contains cocaine is insufficient to support the verdict.

**2. There is no evidence which proves that Travis Lamb intentionally or knowingly possessed *cocaine***

**a. There is no evidence that "bath salts" contain cocaine**

"Bath salts" are a generic term for a collection of designer drugs that are commonly synthetic derivatives of cathinone, the active ingredient of the khat plant. *Drug Fact Sheet: Bath Salts or Designer Cathinones*, DEA *available at* http://www.dea.gov/ druginfo/drug_data_sheets/Bath_Salts.pdf. Many of the drugs considered "bath salts" were made illegal on September 1, 2011. Tex. Health & Safety Code

15

§ 481.103(a)(4). However, unlike cocaine, which is made through a natural process, bath salts are lab created and can be specifically designed to skirt the law. *Synthetic 'Bath Salts' An Evolving Problem For DEA,* NPR (Jun. 30, 2012). There is no federal regulation on what is labeled a "bath salt," and not all active "bath salt" ingredients are prohibited cathinones. Karen Miotto, et al.,*Clinical and pharmacological aspects of bath salt use: A review of the literature and case reports*, 132 DRUG ALCOHOL DEPEND. 1, 1 (2013). There is no guarantee that a person possessing so-called "research chemicals" like "bath salts," recreational drugs created specifically to skirt the law as it existed at the time of the chemical's creation, possesses a prohibited substance. There is no record-based evidence suggesting that "bath salts" are mixed, prepared with, or otherwise contain cocaine; rather "bath salts" were intended as a substitute for illegal drugs like cocaine. *See* Jill Gallus, *Synthetic Cocaine Sold As Legal Substitute To Real Drug*, KVIA (Jun. 26, 2012).

### b. Travis Lamb's incriminatory statement at the scene of the arrest does not indicate that he knowingly possessed *cocaine*

Travis Lamb's potentially incriminatory statement that "it's not meth, it's bath salts" is the only evidence offered regarding whether Mr. Lamb knew the true nature of the crystalline substance. (4 R.R. at 17, 40). *See e.g. Chavez v. State*, 769 S.W.2d 284, 288 (Tex. App.-Houston [1st Dist.] 1989) (incriminating statement made by the accused relevant in possession of a controlled substance case). In *Shults v. State*, the Court of Criminal Appeals held that where trace amounts of heroin were found in a

baggie that a defendant had admittedly used to transport marijuana, the evidence was insufficient to prove possession of *heroin*. *Shults v. State*, 575 S.W.2d 29, 30 (Tex. Crim. App. 1979). As stated in *King*, the burden is on the state to "prove, through other evidence, that appellant had knowledge that the substance in his possession was cocaine." *King*, 895 S.W.2d at 703. There is no record-based or evidence-based reason to disbelieve Travis Lamb's assertion that he thought the drugs were "bath salts."

### c. The physical appearance of the crystalline substance does not indicate the presence of cocaine

The Court of Appeals should closely inspect Exhibit 4-b. A picture of the crystalline substance is attached for the Court's convenience. Appendix A. The substance is composed of small, irregularly shaped, crystals with a translucent, white color. Appendix A. The substance does not resemble the fine, white powder of cocaine in its salt form or jagged, off-white to yellowish nuggets of cocaine in its freebase form. Appendix B, Appendix C, Appendix D. The substance looks more like methamphetamine, but methamphetamine crystals are larger and more transparent (glassy) than the crystalline substance and methamphetamine powder more closely resembles sugar or baking soda than the small, irregular crystals in the crystalline substance. Appendix E, F. Both police officers, who encounter controlled substances on a daily basis, believed that crystalline substance was crystal methamphetamine and the officers did not attempt to test the substance for the presence of cocaine. (3 R.R. at 20; 4 R.R. at 33-34). Analyst Noyola conceded that the

17

crystalline substance was not powder or crack-cocaine, but was purportedly in the form of the "adulterants and dilutants" which happened to contain cocaine. (4 R.R. at 74). The physical properties of the crystalline substance, found in a form not associated with cocaine, is relevant to the determination of whether or not Travis Lamb knowingly possessed cocaine. (4 R.R. at 74).

### d. The laboratory tests, performed under standard conditions, did not indicate the presence of cocaine

Finally, the laboratory performed three tests that should have reported the presence of cocaine in the sample. *Recommended methods for the Identification and Analysis of Cocaine in Seized Materials* at 29, 35. There was no testimony that the crystalline substance was chemically impure, contained a mixture of different substances, or contained substances that would mask the detection of cocaine. When Analyst Noyola performed UV-Vis spectroscopy, FTIR, and GC/MS under standard laboratory conditions, no controlled substance was detected. (4 R.R. at 64-65). If sensitive laboratory instruments could not detect cocaine in a sample prepared from the pure crystalline substance tested under ordinary conditions, there can be no valid argument that an ordinary person could know that there was cocaine on or in the crystals.

**e. Even if Analyst Noyola's testimony is considered, there is insufficient evidence to prove that Travis Lamb knowingly possessed cocaine**

**i. The State's burden of proof is increased when only a trace amount of a controlled substance is found**

Texas courts have long set boundaries on what sort of evidence will support a conviction for possession of a controlled substance. In *Curtis v. State*, the Court of Criminal Appeals held that a field test, paired with an officer's visual "identification" of a controlled substance, was insufficient to support a conviction. *Curtis v. State*, 548 S.W.2d 57, 58–59 (Tex. Crim. App. 1977). In *King v. State*, the Court of Criminal Appeals upheld special evidentiary requirements for proof in cases involving trace amounts of controlled substances, requiring "evidence other than mere possession to prove that the defendant knew the substance in his possession was a controlled substance." *King*, 895 S.W.2d at 703.

**ii. The State failed to prove by evidence other than the mere detection of cocaine by the laboratory that Travis Lamb knew that the crystalline substance contained cocaine**

The laboratory performed no quantification of the substances involved in this case. The laboratory did not report the quantity of cocaine detected in the substance, the quantity of "adulterants and dilutants" in the substance, or the purity of the

cocaine. The laboratory did not even identify which "adulterant and dilutants" were contained within the crystalline substance. Even assuming Analyst Noyola's conclusory testimony constitutes valid evidence, the evidence did not establish that anything more than a trace amount of cocaine was found in the sample. Analyst Noyola simply reported the presence of cocaine in the sample: "I am confident of the analysis that I performed and I am confident to -- to write the results as containing cocaine based on my analysis and the results of those analyses." (4 R.R. at 75). As the State failed to prove that there was a visible, measurable amount of cocaine in the sample tested, the State's burden of proof is heightened under the standard set forth in *King*. *King*, 895 S.W.2d at 703.

The government can only convict after providing "sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 916–917 (Tex. Crim. App. 2010). Officer Gallegos's offhand comment that the officers "were contemplating whether the crystalline substance was meth or powder cocaine" is not sufficient evidence to convict Travis Lamb of possession of cocaine. (4 R.R. at 40). An ordinary police officer is not qualified to classify a crystalline substance forensically, much less by sight. *Curtis,* 548 S.W.2d at 58–59; Tex. Code Crim. Proc., art. 38.35(d)(1). This leaves the laboratory analysis as the State's last opportunity to prove guilt.

Even if Analyst Noyola's conclusory testimony constitutes valid evidence, there is no evidence that Travis Lamb knew, or should have known, that there was cocaine

20

in the crystalline substance. Mr. Lamb thought the substance was "balt salts," police thought the substance was methamphetamine, the analyst could not detect the presence of cocaine under ordinary conditions, and the crystalline substance did not appear to be cocaine or crack. (4 R.R. at 15-17, 33-34, 40, 62-65, 74-75). Analyst Noyola did not know if the crystalline substance had been contaminated with cocaine, nor did Analyst Noyola testify that the cocaine was detected within the crystalline substance, as opposed to a residue on the outside of the crystals. (4 R.R. at 77-79). Cocaine is a very fine powder that is easily spread. David Biello, *Cocaine Contaminates Majority of U.S. Currency*, SCIENTIFIC AMERICAN (August 16, 2009). Whether it was inadvertently spread by police officers, the person manufacturing the "bath salts," lab personnel, or any other person handling the crystalline substance or the plastic baggie it was stuffed inside, without knowing the concentration of cocaine present during the analysis and where the cocaine was found, it is impossible to say that a person knowingly possessed the trace amount of cocaine. Richard Sleeman et al., *Drugs on Money*, 72 ANALYTICAL CHEM. 397, 401 (2000) ("Traces of controlled substances [can] arise from contact with the drug itself, a contaminated hand, or another contaminated item.") Analyst Noyola had to concentrate the pure sample in order to obtain a detectable amount of cocaine, increasing the risk that a contaminant was detected. Again, whatever intent Mr. Lamb may have had to possess bath salts does not supply the requisite culpable mental state for possession of cocaine. *Shults*, 575 S.W.2d at 30.

**E. The current legal standards employed in drug possession cases are unworkable**

**1. A law that makes criminals out of us all**

Rarely does it benefit an appellate advocate to "break down the fourth wall," but the interplay of the precedent employed in controlled substance cases require this departure from the norm. The rule set forth in *Joseph* and *King* regarding trace amounts of controlled substance, even those invisible to the human eye, and the rule set forth in *Seals*, transforming pretty much any substance mixed with a controlled substance into an "adulterant or dilutant," make felons of the innocent. *Joseph v. State*, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995); *King*, 895 S.W.2d at 703; *Seals v. State*, 187 S.W.3d 417, 421 (Tex. Crim. App. 2005). While some claim "the truth shall set you free" and "knowledge in power," innocence is no defense under Section 481.115 of the Health and Safety Code. Be warned: knowing how widespread the problem of controlled substance contamination is will transform any who dare read further into hardened, if unintentional, criminals.

**2. There is no minimum amount of a controlled substance required for conviction under Section 481.115 of the Health and Safety Code and anything mixed with the controlled substance can be considered an "adulterant or dilutant"**

The rule set forth in *King* and clarified in *Joseph* permits the conviction of a person who knowingly possesses a trace amount of a controlled substance, even if it is immeasurable, invisible to the human eye, or microscopic:

> There is no requirement that one must possess a usable amount of a controlled substance in order to be convicted of unlawful possession of a controlled substance. There is also no requirement that the substance be visible to the naked eye.

*Joseph*, 897 S.W.2d at 376; *see also King,* 895 S.W.2d at 703 (upholding a conviction for possession of a microscopic and unweighable amount of cocaine). Unwanted, unusuable waste products of drug use have been held sufficient to support conviction. *Daniels v. State*, 853 S.W.2d 749, 751 (Tex. App.−Houston [1st Dist.] 1993, no pet.) (crack-cocaine residue on a pipe sufficient to support a conviction).

Under *Seals,* the Court of Criminal Appeals noted that the definition of "adulterant of dilutant" had been expanded to encompass literally any material that increased the bulk of a controlled substance, even if the bulk was increased unintentionally:

> One might argue that the legislature meant to include as an adulterant or dilutant only materials that increase the bulk or quantity of the controlled substance before distribution, sale, or consumption and that the legislature meant to exclude waste materials or materials that do not

23

increase the bulk or quantity of salable or usable weight. But these are not the words that the legislature actually used. The drafters of the definition could have easily included these terms, but they did not. More to the point, the drafters could have left the definition that this Court used in McGlothlin v. State and Cawthon, which would have achieved the same result. What message are we to glean from the legislature's omission of the phrases "before distribution, sale, or consumption"; "waste products"; and "salable or usable weight"? The only interpretation that is permitted under the seminal rule of statutory construction: We presume that the legislature meant what it said.

*Seals*, 187 S.W.3d at 421. The combination of *Seals* with the rule set forth in *Joseph* and *King* allow a trace amount of a controlled substance, when inadvertently mixed with a substantial quantity of another product, to serve as the basis of a serious felony conviction.

### 3. Ignorance is bliss: why a little bit of knowledge is a bad thing under Section 481.115 of the Health and Safety Code

In contemplating the *Seals* case, the concurrence and dissent noted that Section 481.115 of the Health and Safety Code skated on thin Constitutional ice, and they considered possible flaws with the plain language of the statute. In Judge Womack's concurring opinion, the Judge noted:

But the statutory definition may be so inclusive as to invite constitutional problems. For example, it is no rarity for suspects to attempt to flush controlled substances down the toilet. […] I would hate to see this Court forced to hold the statute unconstitutional when a prosecutor tried to include all the water in the toilet bowl as part of the controlled substance.

*Seals*, 187 S.W.3d at 423 (J. Womack, concurring). Citing similar examples, Judge Cochran explained in her dissent that a person who vomited up a controlled

24

substance or who urinated out a controlled substance could be convicted for the aggregate weight under the "adulterants and dilutants" provision. *Id.* at 427 (J. Cochran dissenting).

What the Court did not consider are that controlled substance contaminants are encountered on a daily basis and have absolutely nothing to do with the commission of a crime. It has been known for decades that American currency is laced with detectable levels of controlled substances. *See* Jonathan Oyler et al., *Cocaine Contamination of United States Paper Currency*, 20 J. ANALYTICAL TOXICOLOGY 213, 214-215 (1996) (1996 study noting the widespread contamination of currency with cocaine and noting several previous studies conducted in the 1980's regarding the contamination of currency by cocaine reside). It has been noted that cocaine, heroin, 6-acetylmorphine, morphine, phencyclidine, methamphetamine, amphetamine, and MDMA have all been identified on U.S. currency notes. Eric Lavins, *Cannabis (Marijuana) Contamination of United States and Foreign Paper Currency*, 28 J. ANALYTICAL TOXICOLOGY 439, 439 (2004). Cocaine contamination seems to be most frequently observed, with studies reporting over 79% contamination on circulating bills. *Id.* Cocaine contamination is so widespread that many courts have declared that a narcotics dog's positive alert to a large sum of money is insufficient to establish probable cause for forfeiture. *See United States v. U.S. Currency, $30, 060.00*, 39 F.3d 1039, 1041–1043 (9th Cir. 1994) (explaining, in detail, the contamination problem). A person carrying a wallet and aware of the drug contamination problem knowingly

possesses the controlled substances in the wallet. After all, given such high contamination levels, it is reasonably certain that, given one or more bank notes in a wallet, one will find cocaine or another controlled substance. *See* TEX. PENAL CODE § 6.03(b) (defining the culpable mental state of "knowingly").

The problem with drinking water is even more difficult to dismiss. Drinking water contains metabolites and residues of pharmaceutical, industrial, personal care, and other chemicals that are not completely eliminated by the filtration process. P.E. Stackelerg et al., *Persistence of pharmaceutical compounds and other organic wastewater contaminants in a conventional drinking-water-treatment plant*, 324 SCIENCE OF THE TOTAL ENVIRONMENT 99, 101-103 (2004) (Table listing various chemicals detected in processed tap water). Among the many pharmaceutical compounds that have been detected in drinking water are illicit drugs, including codeine, methadone, amphetamine, methamphetamine, MDMA, and cocaine. Christian G. Daughton, *Illicit Drugs: Contaminants in the Environment and Utility in Forensic Epidemiology*, 210 REV. OF ENVIRON. CONTAMINATION AND TOXICOLOGY 59, 77-79 (2011). While it is bad enough that a person understanding the problem of invisible contaminants in drinking water "knowingly possesses" the controlled substances within the drinking water, the drinking water in which the contaminants are found is an "adulterant or dilutant." *See Seals*, 187 S.W.3d at 421. Given that a cup of water weighs over 200 grams, the old advice to "drink eight glasses of eight ounces of water a day" seems a quick road to a lengthy prison sentence.

**4. A new rule must be crafted**

There are other reported avenues of undesired exposure to controlled substance contaminants. Studies have reported that many controlled substances can be transmitted through the air or through dermal (skin) contact. *Illicit Drugs: Contaminants in the Environment and Utility in Forensic Epidemiology* at 77-79. A system of laws that punishes the knowing possession of microscopic, unweighable amounts of controlled substances, given the incredibly sensitive and ever-improving forensic laboratory techniques employed today, quickly turns those aware of the contamination problem into hardened felons. *Joseph*, 897 S.W.2d at 376; *King*, 895 S.W.2d at 703. Additionally, a system of laws that permits the punishment range to vary with physical and chemical processes which "increase the bulk" of a controlled substance, but which occur without a person's intent to actually adulterate or dilute a controlled substance (and maybe even without the person's involvement, such as water naturally absorbed from the air by certain substances) amplifies the risk of wrongful conviction. As the legal standard does not consider whether the person in possession of a trace amount of a controlled substance actually *intends* to possess that controlled substance (what drug user desires waste material such as unusable combustion byproducts lining a pipe or unusable powder residue lining a baggie?) or even whether the possession of a controlled substance is related to criminal activity, it is constitutionally infirm. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 169-171 (1972) (laws that allow the

police wide discretion to arrest the poor and unpopular at an officer's whim are unconstitutional).

The majority of the Judges on the Court of Criminal Appeals agreed that the Texas Controlled Substance Act could be unconstitutional if applied incorrectly. *Seals*, 187 S.W.3d at 422–428 (J. Womack, concurring and J. Cochran dissenting). But the Court cannot "uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). An interpretation of the law which creates criminals of us all is absurd and unintentional. *Whitelaw v. State*, 29 S.W.3d 129, 131 (Tex. Crim. App. 2000). Respectfully, Travis Lamb would ask this Court to reconsider the Court of Criminal Appeals's interpretation of Section 481.115, as the current interpretation leads to absurd and unintended results. Restricting the application of Section 481.115 only to cases where the controlled substance is in usable form (covering an invisible substance like LSD) or is visible, measurable, and not a waste product would limit the potential for wrongful conviction under Section 481.115.

## PRAYER

Respectfully, Travis Lamb would ask this Court to reverse the conviction in Cause No. and direct an acquittal in this case.

Respectfully submitted,

**ALEXANDER BUNIN**
Chief Public Defender
Harris County Texas

28

/s/ Nicolas Hughes
**NICOLAS HUGHES**
Assistant Public Defender
Harris County Texas
1201 Franklin Street, 13th Floor
Houston Texas 77002
(713) 368-0016
(713) 386-9278 fax
TBA No. 24059981
nicolas.hughes@pdo.hctx.net

## CERTIFICATE OF SERVICE

I certify that a copy of this Appellant's Brief (Lamb) has been served upon the Harris County District Attorney's Office − Appellate Section, on May 29, 2015, by electronic service.

/s/ Nicolas Hughes
**NICOLAS HUGHES**
Assistant Public Defender

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the page and word count limitations of TEX. R. APP. P. 9.4(i), if applicable, because it contains 6,708 words excluding portions not to be counted under TEX. R. APP. P. 9.4(i)(1).

/s/ Nicolas Hughes
**NICOLAS HUGHES**
Assistant Public Defender

**APPENDIX**

A. Picture of State's Exhibit 4-b, enlarged to show crystalline substance

B. Picture of power cocaine from DEA website. *Cocaine*, DEA *available at*
http://www.dea.gov/pr/multimedia-library/image-gallery/
images_cocaine.shtml

C. Picture of compressed powered cocaine from DEA website. *Cocaine*, DEA
*available at* http://www.dea.gov/pr/multimedia-library/image-gallery/
images_cocaine.shtml

D. Picture of crack-cocaine from DEA website. *Cocaine*, DEA *available at*
http://www.dea.gov/pr/multimedia-library/image-gallery/
images_cocaine.shtml

E. Picture of crystal methamphetamine from DEA website. *Methamphetamine*,
DEA *available at* http://www.dea.gov/pr/multimedia-library/image-gallery/
images_methamphetamine.shtml

F. Picture of powder methamphetamine from DEA website. *Methamphetamine*,
DEA *available at* http://www.dea.gov/pr/multimedia-library/image-gallery/
images_methamphetamine.shtml







http://www.dea.gov/pr/multimedia-library/image-gallery/cocaine/cocaine_hcl3.jpg



http://www.dea.gov/pr/multimedia-library/image-gallery/meth/ice/ice_methamphetamine_bag.jpg



ice_methamphetamine_bag.jpg (JPEG Image, 3008 × 1960 pixels) - Scaled (38%)

