Marcus D. JACKSON, Appellant

v.

The STATE of Texas, Appellee

NO. 01–14–01010–CR

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued December 17, 2015

Discretionary Review Refused
April 6, 2016

Kyle B. Johnson, Houston, TX, for appellant.

Devon Anderson, District Attorney–Harris County, Carly Dessauer, Assistant District Attorney, Houston, TX, for state.

Panel consists of Justices Jennings, Keyes, and Bland.

## OPINION

Evelyn V. Keyes, Justice

A jury convicted appellant, Marcus D. Jackson, of the third-degree felony offense of possession of between one and four grams of phencyclidine, or PCP. After finding the allegations in two enhancement paragraphs true, the trial court assessed his punishment at thirty-five years' confinement.[1] In one issue, appellant contends that the State failed to present sufficient evidence that he possessed more than one gram of PCP.

We affirm.

## Background

On March 4, 2014, Houston Police Department ("HPD") Officers J. Sneed and D. Morelli were working an extra security job at an apartment complex in southeast Houston. Officer Sneed had been working as a security officer at this apartment complex for approximately five or six years, which he stated is "known as the PCP capital of Houston." He testified that he has "frequently" made narcotics arrests at this apartment complex, and when he makes such an arrest, the individuals are "typically" in possession of PCP.

On the day of the offense, Officer Sneed parked his personal vehicle in a parking lot at the complex, and the officers watched for suspicious activity. Appellant entered the complex through a pedestrian gate and

1. *See* Tex. Health & Safety Code Ann. § 481.102(8) (Vernon 2010) (classifying phencyclidine as controlled substance in penalty group one); *id.* § 481.115(a), (c) (Vernon 2010) (providing that possession of between one and four grams of substance in penalty group one is third-degree felony).

started walking down a sidewalk and looking down the breezeways between each building, as if "he was looking for someone." Officer Sneed testified that because he had worked at the complex for several years, he was "fairly familiar" with the residents, but he had never seen appellant before, which drew his attention. Appellant stopped at the end of the parking lot and waited for four or five minutes before another man approached him. Appellant and the other man started talking and walked out of sight into one of the breezeways. Officer Sneed suspected that appellant was engaged in a narcotics transaction, so he began driving toward where appellant had been standing. While Officer Sneed moved his car, appellant walked out of the breezeway and started quickly walking back toward the pedestrian gate.

Officer Sneed parked his car, and both officers began walking toward appellant. Officer Sneed testified that he could smell the odor of PCP when he got within ten feet of appellant. Officer Sneed testified that the most common way people at this apartment complex use PCP is to fill little bottles with liquid PCP and then dip cigarettes in the PCP to smoke. Cigarettes dipped in PCP—or "PCP sticks," as Officer Sneed referred to them—have a "real strong" and "pungent" odor, almost like nail polish remover. Officer Sneed could smell the odor of PCP before he began to speak with appellant.

Officer Sneed asked appellant if he lived at the apartment complex, and appellant responded that he did not. Officer Sneed looked down and saw appellant holding something in his right hand. He asked appellant "if he was holding a PCP stick." Appellant said "yes," and he opened up his hand to show Officer Sneed a cigarette that had been dipped in PCP. Officer Morelli handcuffed appellant, and at that point, Morelli discovered that appellant

"had another PCP stick" in his left hand as well. Appellant admitted, "I've had rough times at the house. I was just trying to smoke them away."

In court, Officer Sneed identified State's Exhibit 2 as "the PCP cigarettes, two of them." Officer Sneed agreed that the cigarettes appeared to be "in the same or substantially the same condition as when [he] found them," although he noted that the forensics lab had pulled them apart for testing. Officer Sneed stated, "I can still smell them even though it's in three bags."

Officer Morelli testified that he bagged and submitted the narcotics evidence for storage and testing. He characterized the narcotics evidence in this case as "PCP cigarettes," which he placed in a plastic bag and then sealed inside of an envelope. Officer Morelli testified that State's Exhibit 2 was "the same narcotics that [he] found on the defendant," which he identified as "two cigarettes." Officer Morelli stated that both cigarettes were the same brand, and he also agreed that the cigarettes appeared "to be in the same or in substantially the same condition as when [he] found them." Officer Morelli stated on cross-examination that appellant had one PCP cigarette in his right hand and one in his left hand at the time the officers encountered him.

Mariam Kane, a chemist with the City of Houston Forensic Science Center, conducted the lab analysis on the PCP cigarettes recovered from appellant on April 11, 2014, five weeks after appellant's arrest. Kane testified that the two cigarettes weighed 1.93 grams. Kane also tested the cigarettes and concluded that the cigarettes contained PCP. Kane testified that she has dealt with cigarettes that have been dipped in PCP before, and she noted that both cigarettes were "discolored." She testified that when a cigarette tests positive for PCP, she weighs the

entire cigarette because most of the time when a cigarette is dipped in PCP "the whole cigarette contain[s] PCP," including the filter of the cigarette. Kane also testified that "adulterants and dilutants" are "any substance that is added to a controlled substance to increase the weight or the quantity of the controlled substance regardless of the effect on the activity of the controlled substance."

Kane agreed with appellant, who represented himself pro se at trial, that a cigarette absorbs whatever liquid it touches. Appellant and Kane had the following exchange:

> [Appellant]: PCP, it sucks in, it's a fluid, it sucks in, it takes up everything, filters everything, whatever it touches, it's pretty much what?
>
> [Kane]: Contaminated, yes.
>
> [Appellant]: Everything is pretty much contaminated?
>
> [Kane]: Yes.
>
> [Appellant]: By whatever it touches? So it is safe to say that when it touched this bag [in which Officer Morelli placed the two cigarettes], this bag became contaminated?
>
> [Kane]: It's possible, but I have to test inside the bag to tell you for sure.

Kane testified that she received an envelope "containing a Ziploc containing two discolored manufactured cigarettes." Kane also testified that the two discolored cigarettes were in the same bag when she received them for testing, but she then separated them and placed them in separate bags after conducting the tests. Appellant again asked whether anything the PCP touches becomes contaminated, and Kane responded, "It's possible it caused contamination, yeah, if it touch[ed] the cigarette that contains PCP, yeah."

The jury found appellant guilty of the offense of possession of between one and four grams of PCP. The trial court, after finding the allegations in two enhancement paragraphs true, assessed his punishment at thirty-five years' confinement. This appeal followed.

## Sufficiency of the Evidence

In his sole issue, appellant contends that the State failed to present sufficient evidence that he possessed more than one gram of PCP. Appellant does not challenge the fact that he possessed PCP; rather, he challenges solely the amount of PCP that he possessed.

### A. Standard of Review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim.App.2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex.Crim.App.2008). The jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim.App.1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex.App.–Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted).

We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742,

750 (Tex.Crim.App.2007). We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State,* 253 S.W.3d 699, 705 (Tex.Crim.App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex.Crim. App.2000); *see also Clayton v. State,* 235 S.W.3d 772, 778 (Tex.Crim.App.2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State,* 343 S.W.3d 152, 155 (Tex. Crim.App.2011) (quoting *Clayton,* 235 S.W.3d at 778). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim.App.2007).

### B. Possession of At Least One Gram of PCP

To establish the offense of possession of PCP, the State had to prove that appellant knowingly or intentionally possessed between one and four grams, including adulterants or dilutants, of PCP. *See* Tex. Health & Safety Code Ann. § 481.115(c) (Vernon 2010); *see also Hubert v. State,* 312 S.W.3d 687, 690 (Tex.App.–Houston [1st Dist.] 2009, pet. ref'd) (stating that prosecution must demonstrate that defendant (1) exercised care, custody, control, or management over contraband and (2) knew matter possessed was contraband).

█ An "adulterant or dilutant" is "any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance." Tex. Health &

Safety Code Ann. § 481.002(49) (Vernon Supp. 2015); *see id.* § 481.002(5) (defining "controlled substance" as "a substance, including a drug, an adulterant, and a dilutant, listed in ... Penalty Group 1 ..." and stating that term "includes the aggregate weight of any mixture, solution, or other substance containing a controlled substance"). The State is not required to determine the amount of controlled substance and adulterant or dilutant that constitute the mixture. *Melton v. State,* 120 S.W.3d 339, 344 (Tex.Crim.App.2003); *Graham v. State,* 201 S.W.3d 323, 328 (Tex.App.–Houston [14th Dist.] 2006, pet. ref'd) ("[A]ny substance that is added to or mixed with a controlled substance, regardless of when, how, or why that substance was added, may be added to the aggregate weight of the controlled substance as an adulterant or dilutant.") (quoting *Seals v. State,* 187 S.W.3d 417, 420 (Tex.Crim.App. 2005)). Instead, the State only has to prove that the aggregate weight of the controlled substance mixture, including any adulterants and dilutants, equals the alleged minimum weight. *Melton,* 120 S.W.3d at 344; *Isassi v. State,* 91 S.W.3d 807, 810 (Tex.App.–El Paso 2002, pet. ref'd). Expert testimony by a police officer, based on visual observation and the officer's training and experience, that a substance is a controlled substance constitutes proper evidence. *See Melton,* 120 S.W.3d at 343 (citing *Henson v. State,* 915 S.W.2d 186, 192 (Tex.App.–Corpus Christi 1996, no pet.)).

█ Appellant does not contest that he knowingly or intentionally possessed PCP. Rather, he argues that the State failed to present evidence that he possessed at least one gram of PCP because although both cigarettes confiscated from appellant were weighed by Kane, and thus both cigarettes were included in her determination that appellant possessed 1.93 grams of PCP,

the State did not establish that both cigarettes contained PCP at the time of appellant's arrest. He instead argues that only one cigarette contained PCP at the time of his arrest, that the PCP in that cigarette "contaminated" the other, unadulterated cigarette because both cigarettes were stored in the same bag for several weeks in between the time of appellant's arrest and the time Kane tested and weighed the cigarettes, and that as a liquid, PCP has the potential to be absorbed into and contaminate anything that it touches.

The officers testified that at the time of his arrest, appellant was holding two cigarettes of the same brand and that appellant smelled strongly of PCP. Both officers identified the cigarettes as "PCP cigarettes." The cigarettes were admitted into evidence at trial, and both officers testified that the cigarettes appeared the same or substantially the same in court as they had at the time of arrest. Both cigarettes appeared discolored at the time of trial. *See Gabriel v. State*, 900 S.W.2d 721, 722 (Tex.Crim.App.1995) (plurality op.) ("It was rational for the factfinder to conclude that identically packaged substances, which appear to be the same substance, are in fact the same substance."). The jury could reasonably infer from the evidence presented that both cigarettes had been dipped in PCP at the time of appellant's arrest and that, therefore, both cigarettes were properly included in Kane's analysis of the aggregate weight of the PCP. *See Clayton*, 235 S.W.3d at 778 (stating that fact finder has duty to resolve conflicts in testimony, weigh evidence presented, and "draw reasonable inferences from basic facts to ultimate facts"); *see also Melton*, 120 S.W.3d at 344 (holding that State is not required to determine amount of controlled substance and amount of adulterant and dilutant but instead only has to prove that aggregate weight of controlled substance mixture, including adulterants and dilutants, equals alleged minimum weight). Kane testified that both cigarettes tested positive for PCP and that, combined, the cigarettes weighed 1.93 grams.

We conclude that, when viewing the evidence in the light most favorable to the verdict, the jury could have concluded, beyond a reasonable doubt, that appellant possessed at least one gram of PCP, including adulterants and dilutants. *See Melton*, 120 S.W.3d at 344; *Graham*, 201 S.W.3d at 329; *Isassi*, 91 S.W.3d at 810.

We overrule appellant's sole issue.

### Conclusion

We affirm the judgment of the trial court.

Jennings, J., concurring, joined by Keyes, J.

Terry Jennings, Justice, concurring.

"Insanity" has been defined "as doing the same thing over and over again and expecting different results."[1] The thirty-five-year prison sentence assessed against appellant, Marcus Jackson, in the instant narcotics case illustrates the point.

Here, the trial court sentenced appellant to confinement for thirty-five years for the third-degree felony offense of possession of two cigarettes dipped in phencyclidine ("PCP"), which together weighed 1.93

---

1. Although this definition is commonly attributed to Albert Einstein, it appears that it actually comes from a novel written by Rita Mae Brown. *See* THE ULTIMATE QUOTABLE EIN-STEIN 473–74 (Alice Calaprice ed., 2011 ed. 2011) (crediting Rita Mae Brown and noting quote "[m]isattributed to Einstein").

grams,[2] less than a restaurant-size packet of sugar. Because appellant had twice been previously convicted of the felony offense of possession of a controlled substance, the punishment range for the instant offense is confinement in prison from twenty-five years to life.[3]

At the punishment hearing in this case, appellant admitted that he had, from May 1997 through March 2009, been convicted five times of the offense of possession of a controlled substance, namely PCP or cocaine, once of the offense of delivery of cocaine, and once of the offense of criminal mischief For these crimes, he received punishments ranging from thirty days in county jail, for possession of PCP in 2008, to four years in prison, for possession of PCP in 2009. In all, he estimated that he had been previously incarcerated by the state for approximately seven years.

Prior to the trial court's sentencing, appellant pleaded:

As of now I have been found guilty of PCP. I made a mistake. I didn't—I wasn't out robbing, stealing, killing no one. I wasn't nothing. The only pain I was inflicting was upon myself. Things happen for a reason. Maybe this is for a reason. That's not for me to decide, but that is maybe what I asked for in a sense, because I can only speak on my religion and the way I talk to God. I asked Him every time that I knew I wasn't supposed to be smoking again, I was going to stop. I was going to stop.

But at the time there was pressure upon me.

I left the house at 18 on bad terms with my father. We had a fight. I got out of jail. I moved back home. We were okay. After a while, maybe a month or two months after I was released, after my mother passed, he kicked me out. I was staying in my car for a month. Never resorted to going back to hustling. Never even thought about going to take something from anyone else. It's just not the type of person I am. I stand by what I believe is true and what is to be honest. Do I think that I should be sent away for 25 years or better for this crime? No....

. . . .

All I'm asking is to be treated fairly. Be treated just.

Appellant then asked the trial court for drug rehabilitation and treatment in lieu of a harsh punishment, and the following exchanged occurred:

The Court: ... So let me ask you this. Obviously you must have a drug problem. Do you admit to that or not?

[Appellant]: Yes, I do, Your Honor.

The Court: With these three pen trips, seven years in the penitentiary, do they have programs in the penal system, in the penitentiary, that you could take advantage of to talk about your drug use?

[Appellant]: The only thing that I have been to was those that are called, I

---

**2.** *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(8) (classifying phencyclidine as controlled substance in penalty group one), 481.115(a), (c) (Vernon 2010) (possession of between one and four grams of substance in penalty group one a third-degree felony).

**3.** *See* TEX. PENAL CODE ANN. § 12.42(d) (Vernon Supp. 2015) ("[I]f it is shown on the trial of a felony offense other than a state jail felony punishment under Section 12.35(a) that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction the defendant shall be punished by imprisonment in the Texas Department of Criminal Justice for life, or for any term not more than 99 years or less than 25 years.").

believe, like the program that you're supposed to go to before release. They are not like drug [programs]—

The Court: Did you go to those programs?

[Appellant]: Yes, I did.

The Court: Did the programs have to do with your use of drugs?

[Appellant]: No, it did not.

The Court: Addictions and that type of thing?

[Appellant]: No, it did not.

The Court: So you're saying in the seven years that you've been incarcerated in the penal system in this state, you have never had any sort of information or drug rehab classes or training?

[Appellant]: I have never had a drug rehab class, Your Honor.

Of course, in assessing appellant's punishment, the trial court may simply have disbelieved appellant's testimony and his expressed desire for treatment and rehabilitation. Regardless, the trial court's hands were tied—it had to assess appellant's punishment for possession of the two cigarettes dipped in PCP at confinement for at least twenty-five years.[4] This is the law.[5] The Texas Legislature says so.[6] And, no doubt, many people of goodwill believe this should be the law.

However, many law enforcement officials and policy makers are beginning to question whether men and women addicted to narcotics like appellant, should, in his words, "be sent away for 25 years or better" for the simple possession of a miniscule amount of a controlled substance.

Houston Police Department Chief Charles McClelland recently expressed concern, stating:

> The criminal justice system cannot sustain itself under the overwhelming numbers [of individuals] we're putting in the system.... We are creating generations of young men and women, especially young, minority men, who will be unemployed for the rest of their lives.
>
> . . . .
>
> When we have mandatory sentencing laws for minor crim[inal] offenses, drug offenses, for people who are really not the greatest threat to community safety, and who are using massive amounts of law enforcement resources, there has to be a better way.[7]

United States Senator John Cornyn, noting that "our prisons are overcrowded" and our criminal justice system "often perpetuates a vicious cycle in which prisoners are released unprepared to succeed," [8] has

---

**4.** See id.; see also Mizell v. State, 119 S.W.3d 804, 806 (Tex.Crim.App.2003) ("A sentence that is outside the maximum or minimum range of punishment is unauthorized by law and therefore illegal."); Farias v. State, 426 S.W.3d 198, 200 (Tex.App.–Houston [1st Dist.] 2012, pet. ref'd) (noting sentence void if below minimum sentencing range).

**5.** See TEX. PENAL CODE ANN. § 12.42(d).

**6.** See TEX. CONST. art. III, § 1 (creating Texas Legislature and vesting it with lawmaking power); Wright v. State, 527 S.W.2d 859, 870 (Tex.Crim.App.1975) (noting legislature "affixe[s]" "range of punishment" for "conduct found by the jury to have been committed");

State ex rel. Smith v. Blackwell, 500 S.W.2d 97, 104 (Tex.Crim.App.1973) ("[T]he Legislature is invested with the law-making power of the people and may define crimes and prescribe penalties.").

**7.** St. John Barned–Smith, HPD's Chief Seeks Reform, HOUS. CHRON., Nov. 22, 2015, at B1.

**8.** John Cornyn & Sheldon Whitehouse, How to Cut Crime and Save Money, CNN.COM (Oct. 21, 2015, 4:50 PM), http://www.cnn.com/2015/10/21/opinions/cornyn-whitehouse-criminal-justice-reform/. Chief McClelland has expressed a similar sentiment:

> [I]f you think about it, we are sentencing these people we arrest on a very frequent

recently introduced "historic bipartisan legislation to reform our nation's criminal justice system"—the Sentencing Reform and Corrections Act of 2015.[9] In doing so, he explained that from 1940 through 1980, the federal-prison population was stable at approximately 24,000 inmates, but today there are over 200,000 men and women in federal prison.[10]

Likewise, Texas has experienced a similar exponential growth of our prison population. In 1945, Texas's prison-inmate population was 3,270.[11] In 2014, it was 166,043, more than any other state in the country.[12]

Further, as of 2010, the United States was spending more than $80 billion on criminal corrections expenditures at federal, state, and local levels.[13] And one study has found that "[c]rime-related expenditures generate a significant strain on state and federal budgets" and "[t]oday's high rate of incarceration is considerably costly ... with state governments bearing the bulk of the fiscal burden."[14]

For instance, in 2012, Texas spent $50.04 per person, per day to incarcerate a

basis for minor crimes to life sentences.... [I]f a person has nothing to be released to—no family structure, no opportunity for legitimate employment, no education, no job skills—the system is almost guaranteeing you're going to get involved in some illegal activity and go back to prison.
Barned–Smith, *supra* note 7, at B1.

9. *See* Sentencing Reform and Corrections Act of 2015, S. 2123, 114th Cong. (2015); *see also United States v. Saena Tech Corp.*, Nos. 14–66(EGS), 14–211(EGS), 140 F.Supp.3d 11, 41–47, 2015 WL 6406266, at *25–29 (D.D.C. Oct. 21, 2015) (noting current national focus on "reducing sentencing disparities and lowering the offense levels applicable to certain drug crimes," including legislation "currently pending in Congress" aimed at "reduc[ing] mandatory-minimum sentences in certain cases and otherwise provid[ing] more opportunity for the sentences of drug offenders to be more closely tailored to the particular offense"); SAFE Justice Act, H.R. 2944, 114th Cong. (2015) (bipartisan legislation aimed at limiting application of federal mandatory minimum drug sentences to highest-level offenders); Smarter Sentencing Act of 2015, S. 502, H.R. 920, 114th Cong. (2015) (bipartisan legislation aimed at reducing costs of prison populations by creating fairer, less costly minimum terms for nonviolent drug offenders); Justice Safety Valve Act of 2015, S. 353, H.R. 706, 114th Cong. (2015) (bipartisan legislation aimed at allowing federal courts to sentence criminal defendants below mandatory minimum sentenced if term fails to fulfill goals of punishment and other sentencing criteria).

10. *See* Cornyn & Whitehouse, *supra* note 8.

11. *See* Paul M. Lucko, *Prison System*, *in* 5 THE NEW HANDBOOK OF TEX. 341, 343 (Ron Tyler et al. eds., 1996).

12. *See* E. Ann Carson, *Prisoners in 2014*, U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS 3 (Sept. 2015), http://www.bjs.gov/content/pub/pdf/p14.pdf.

13. *See* Melissa S. Kearney et al., *Ten Economic Facts about Crime and Incarceration in the United States*, THE HAMILTON PROJECT 2, 13 (May 2014), http://www.brookings.edu/=/media/research/files/papers/2014/05/01% 20crime% 20facts/v8_thp_10crimefacts.pdf (noting "more than 90 percent" of $80 billion corrections expenditures "occur[ed] at state and local levels"); Aimee Picchi, *The High Price of Incarceration in America*, CBSNEWS.COM (May 8, 2014, 5:53 AM), http://www.cbsnews.com/news/the-high-price-of-americas-incarceration-80-billion/ (explaining United States spent more than $80 billion on corrections expenditures at federal, state, and local levels in 2010); *see also* Matt Vespa, *Our Ruinously Expensive Criminal Justice System*, TOWNHALL.COM (July 17, 2015), http://townhall.com/tipsheet/mattvespa/2015/07/17/criminal-justice-event-n20260 28 (noting "our criminal justice system has seen an explosion in government spending on the federal level amounting to an 800 percent increase").

14. Kearney et al., *supra* note 13, at 12–13.

single individual in a Texas prison.[15] At that time, there were approximately 137,095 individuals incarcerated in Texas prisons, meaning the state was paying $6,860,233.80 per day to imprison such individuals.[16] Further, of the 137,095 individuals in Texas prisons in 2012, 20,313 of them were incarcerated for drug-related offenses, approximately fifty-one percent of which were possession-only drug offenses.[17] Thus, based on these figures, in 2012, Texas spent $516,963.24 per day to incarcerate individuals, like appellant, in prison for possession-only drug offenses.[18] And this amount does not include the $144,658.80 also spent per day by the state to incarcerate individuals in Texas state jails for possession-only drug offenses.[19]

Of course, the human toll cannot be calculated.

Perhaps it is time for the Texas Legislature to follow Chief McClelland's and Senator Cornyn's leads and consider whether it is really worth the cost, in both human and financial terms, to impose decades-long prison sentences on nonviolent offenders like appellant. Maybe, as pointed out by Chief McClelland, onerous prison sentences for nonviolent offenders are only making matters worse, feeding an insatiable criminal justice machine that, in Senator Cornyn's words, "often perpetuates a vicious cycle in which prisoners are re-leased unprepared to succeed"?[20] As explained by Chief McClelland:

There are many who believe that the criminal justice system is broken. I'm certainly not one to believe it's broken; it's producing the results it's designed to produce.

If we want different results, the system must be reformed. Because it's doing exactly what it is designed to do.[21]

Then again, maybe Chief McClelland is wrong and we will get a different result this time. Maybe, just maybe, this time appellant will emerge from prison not an addict, but completely rehabilitated and employable.

**15.** *See* LEGISLATIVE BUDGET BD., CRIMINAL JUSTICE UNIFORM COST REPORT, FISCAL YEARS 2010 TO 2012 8 (Jan. 2013), http://www.lbb.state.tx.us/Public_Safety_Criminal_Justice/Uniform_Cost/Criminal% 20Justice% 20Uniform% 20Cost% 20Report% 20Fiscal% 20Years% 202010% 20to% 202012.pdf.

**16.** *See id.*; TEX. DEP'T OF CRIMINAL JUSTICE ("TDCJ"), FISCAL YEAR 2012 STATISTICAL REPORT 1, http://www.tdcj.state.tx.us/documents/Statistical_Report_FY2012.pdf.

**17.** *See* TDCJ, *supra* note 16, at 1, 9 (10,331 individuals incarcerated in Texas prisons in 2012 for possession-only drug offenses).

**18.** *See* LEGISLATIVE BUDGET BD., *supra* note 15, at 8; TDCJ, *supra* note 16, at 9.

**19.** *See* LEGISLATIVE BUDGET BD., *supra* note 15, at 8 (costs state $42.90 per person, per day to incarcerate individual in Texas state jail); TDCJ, *supra* note 16, at 9 (in 2012, 3,372 individuals incarcerated in Texas state jails for possession-only drug offenses).

**20.** *See* Cornyn & Whitehouse, supra note 8.

**21.** Barned–Smith, *supra* note 7, at B1.